EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| In re:<br><br>    Angel Figueroa Vivas | 2002 TSPR 115<br><br>157 DPR _____ |

Número del Caso: TS-4270


Fecha: 11 de septiembre de 2002


Comisionado Especial:

                Hon. Abner Limardo

Oficina de Procurador General:

                Lcda. Edna Evelyn Rodríguez Benítez
                Procuradora General Auxiliar

Abogados de la parte Peticionaria:

                Lcdo. Héctor Santiago Rivera
                Lcda. Irma Valldejuli Pérez


 Materia: SOLICITUD DE REAPERTURA DE PROCEDIMIENTOS




     Este documento constituye un documento oficial del Tribunal
     Supremo que está sujeto a los cambios y correcciones del proceso
     de compilación y publicación oficial de las decisiones del
     Tribunal. Su distribución electrónica se hace como un servicio
     público a la comunidad.

TS-4270

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

In re                                    TS-4270

Ángel Figueroa Vivas

Sala Especial integrada por el Juez Asociado señor Rebollo López como su Presidente, y los Jueces Asociados señores Hernández Denton y Corrada del Río

RESOLUCIÓN

San Juan, Puerto Rico, a 11 de septiembre de 2002.

I

El 20 de marzo de 1996 el señor Ángel Figueroa Vivas (en adelante "el Peticionario") presentó ante este Tribunal una petición solicitando la reapertura de los procedimientos de su separación permanente de la profesión de abogado decretada en *In re Colton Fontán,* 128 D.P.R. 1 (1991). Alegó que en los procedimientos de su desaforo hubo fraude al Tribunal debido a la ocultación de prueba exculpatoria y favorable.

Luego de varios trámites, mediante Resolución de 16 de enero de 1998, reactivamos al ex-juez Superior Hon. Abner Limardo Sánchez como Comisionado Especial, para que previa audiencia a las partes, entiéndase el Peticionario y el Procurador General, y conforme al trámite de rigor, evaluara la petición de reapertura y los planteamientos, y rindiera un informe con sus recomendaciones.

Se celebró una conferencia el 19 de febrero de 1998 convocada por el Comisionado Especial[1] en la cual éste expuso el procedimiento a seguirse para llevar a cabo su encomienda. Se le informó a las partes que el procedimiento comprendería dos fases. La primera consistiría en determinar la procedencia

---

[1] Véase Acta de la Conferencia celebrada el 19 de febrero 1998 y Orden.

de la solicitud de reapertura del Peticionario y la segunda, que presupondría la previa determinación de la procedencia de la solicitud de reapertura, consistiría en determinar si la misma amerita que el Comisionado Especial enmiende en todo o en parte sus conclusiones de hechos que conciernen al Peticionario de su informe rendido a este Tribunal en la Resolución de 27 de mayo de 1987 en el caso que culminó con nuestra decisión en *In re Colton Fontán, supra.*

Se hizo constar en la referida Acta que la determinación en la primera fase de si procede la solicitud de reapertura se llevaría a cabo mediante la celebración de vista plenaria y si como resultado de esa vista el Comisionado Especial determinara que no procede la reapertura solicitada bajo ninguno de sus extremos o razones invocadas por el Peticionario en su solicitud, éste emitirá una resolución exponiendo los fundamentos de su determinación la cual será su informe final a este Tribunal. En este supuesto, con la resolución concluirían las funciones y encomienda del Comisionado Especial y no sería necesario proseguir a la segunda fase. Cualquier trámite ulterior de las partes sería dirigido al Tribunal propiamente.

Subsiguiente, se celebró una vista ante el Comisionado Especial el 21 de abril de 1998[2], a la cual comparecieron el Peticionario, los abogados del Peticionario, Lcda. Irma R. Valldejuli y el Lcdo. Héctor Santiago Rivera; y la Procuradora General Auxiliar Lcda. Edna Evelyn Rodríguez Benítez. Entre los asuntos tratados en dicha vista el Comisionado Especial informó, y las partes acordaron, que la norma general de evaluación de la evidencia a utilizarse en la determinación de la procedencia de la reapertura solicitada, incluye que se trate de evidencia que (a) sea esencial, (b) probablemente hará cambiar las determinaciones de hechos originalmente formuladas y el resultado del caso en lo que al Peticionario concierne y (c) no pudo ser descubierta y presentada en la vista en su fondo a pesar del ejercicio de una diligencia razonable antes de la misma por el Peticionario.

Surge de dicha Acta, además, que el Comisionado Especial expresó su conformidad al juicio de las partes al efecto de que las controversias sobre admisibilidad de la prueba a presentarse en la vista deberían quedar resueltas con antelación al inicio de dicha vista. Las partes someterían sus respectivos escritos en que discutirían sus posiciones legales a favor y en contra de la admisibilidad de la prueba a ser sometida por el Peticionario y sobre cuya admisibilidad prevalezca controversia.

A tenor con lo acordado, el Peticionario presentó una serie de documentos que se proponía someter en evidencia durante la vista en los méritos de su petición. El Procurador General presentó el 4 de mayo de 1998 una extensa moción informando la posición de éste en torno a la admisibilidad de la evidencia propuesta por el Peticionario.

A los fines de evaluar la admisibilidad de la evidencia propuesta, el Procurador General tomó en consideración, además de las disposiciones de las Reglas de Evidencia de Puerto Rico, los requisitos dispuestos en la Regla 188(a) de Procedimiento Criminal y nuestra jurisprudencia, para que prospere una moción de nuevo juicio fundada en el descubrimiento de nueva prueba, a saber:

> i)   la evidencia no pudo descubrirse con razonable diligencia antes del juicio;
> ii)  no es prueba acumulativa;
> iii) no impugna la prueba aducida durante el juicio;
> iv)  es de naturaleza creíble; y

---

[2] Véase Acta de la Vista Celebrada el 21 de abril de 1998 y Orden.

v)    probablemente produciría un resultado diferente.[3]

El 8 de mayo de 1998, ambas partes sometieron al Comisionado Especial un "Informe Conjunto" en el que se relacionó la prueba documental sobre la cual no existe objeción y la prueba documental objetada.

El 22 de mayo de 1998, el Procurador General sometió un memorial de derecho para sustentar sus objeciones a la admisibilidad de la prueba documental propuesta por el Peticionario.

El 8 de junio de 1998 se presentó ante el Comisionado Especial el "Memorial de Derecho del Peticionario", en el cual, entre otros planteamientos, respondió al memorial del Procurador General sobre la admisibilidad de la prueba documental.

Luego de otros trámites, el Comisionado Especial emitió la Resolución de 25 de agosto de 1998, archivada el 26 de agosto de 1998,[4] mediante la cual dispuso de las cuestiones pendientes en cuanto a la admisibilidad de la evidencia. Allí el Comisionado Especial expresó lo siguiente:

> "Vista la naturaleza de la Sentencia del 21 de febrero 91 que decretó la separación permanente de la profesión de abogado del peticionario, se exige que extendamos en la consideración de la Solicitud de Apertura normas aplicables propias de la moción de nuevo juicio del procedimiento criminal. Por tanto, resolvemos las objeciones del Procurador General a la admisión en evidencia de las pruebas presentadas por el peticionario en apoyo a la Solicitud de Reapertura de acuerdo a las Reglas de Evidencia y dichas normas".

El Comisionado Especial, en dicha resolución, decretó que todos los documentos objetados por el Procurador General y enumerados en la Parte II del Informe Conjunto sometido por las partes el 8 de mayo de 1998, documentos del 1 al 79, no eran admisibles en evidencia por diversas razones, a saber: 1) que el señor Figueroa Vivas las pudo haber conseguido con una mera diligencia, 2) el Fiscal Especial Independiente (FEI) no estaba obligado a entregarlos de acuerdo a las órdenes expedidas por el Comisionado Especial durante las vistas de desaforo en el 1987, 3) el peticionario no demostró que el FEI estuviese en posesión de la prueba ocultada, 4) dichos documentos no aparecieron entre los exhibits acompañados por el Senado o la Oficina del FEI ante el Tribunal depositados con la Secretaría del Tribunal Superior de San Juan ni fue anunciado como prueba de cargo contra el peticionario o los restantes querellados en la vista en su fondo de este caso, 5) el peticionario estuvo durante las segundas autopsias, por efecto de esa relación el Peticionario pudo obtener las declaraciones de los patólogos mediante un ejercicio de razonable diligencia, liberando de responsabilidad al FEI y al Senado. Además, el Comisionado Especial concluyó que dicha prueba no constituye prueba exculpatoria ni representaría modificación en las determinaciones de hechos del resultado del caso al que llegó en su informe original.

Mediante Revisión de Resolución del Comisionado Especial y Solicitud de Remedio presentada ante nos el 30 de septiembre de 1998, acompañada de una moción en auxilio de jurisdicción, el Peticionario cuestionó la

---

[3] Véanse *Pueblo v. Morales Rivera,* 115 D.P.R. 88 (1984); *Pueblo v. Beltrán*, 73 D.P.R. 509 (1952); *Pueblo v. Ortiz*, 68 D.P.R. 681 (1948); y *Pueblo v. Morales*, 66 D.P.R. 10 (1946).

[4] Esta Resolución fue enmendada mediante la Resolución Nunc Pro Tunc de 19 de junio de 2001, archivada el 22 de junio de 2001.

referida resolución del Comisionado Especial y alegó que éste se inhabilitó para presidir el proceso al llegar a conclusiones en cuanto al contenido de la prueba.

El 5 de octubre de 1998, mediante Resolución al efecto, le concedimos término al Procurador General para exponer su posición, lo cual hizo mediante Escrito en Cumplimiento de Orden presentado el 12 de noviembre de 1998, oponiéndose a lo solicitado por el Peticionario.

El Peticionario presentó Réplica al escrito del Procurador General el 23 de noviembre de 1998.

Mediante Resolución de 10 de febrero de 1999[5] dictaminamos que la determinación inicial que realiza un Comisionado Especial, en cuanto a exclusión de evidencia, puede ser revisada *de novo* por este Tribunal una vez el Comisionado emite su informe y que en ese momento las partes pueden impugnar cualquier determinación sobre la admisión o exclusión de prueba. 4 L.P.R.A. Ap. XXI-A, R. 14(l). En vista de ello, y ya que el Comisionado Especial no había resuelto todos los planteamientos ante su consideración, incluyendo aspectos sobre la admisibilidad de otra prueba ofrecida en evidencia, declaramos no ha lugar la petición de revisión del Peticionario, en esa etapa de los procedimientos. Señalamos que el Peticionario podrá formular nuevamente sus planteamientos ante nos una vez el Comisionado Especial finalice su encomienda y rinda su informe.

Luego de varios trámites,[6] la vista evidenciaria de la procedencia de la Solicitud de Reapertura se llevó a cabo ante el Comisionado Especial los días 23, 24 y 25 de marzo, 8 de abril y 9 de diciembre de 1999.

El 22 de junio de 2001 el Comisionado Especial rindió un extenso Informe a este Tribunal sobre la solicitud de reapertura del Peticionario.

El 13 de agosto de 2001 el Peticionario presentó su extensa Réplica a dicho informe, quedando el asunto sometido a nuestra consideración.

II

Debemos disponer en primer término de las cuestiones relacionadas con la admisibilidad de evidencia propuesta por el Peticionario que fuera objetada por el Procurador General según antes reseñado. El Comisionado Especial atendió estas cuestiones en su Resolución de 25 de agosto de 1998, según enmendada, mediante Resolución Nunc Pro Tunc emitida el 19 de junio de 2001, radicada el 22 de junio de 2001.

Ratificamos, bajo los hechos particulares del caso de autos, la actuación del Comisionado Especial de aplicar las Reglas de Evidencia así como las normas que rigen cuando se presenta una moción de nuevo juicio en un procedimiento criminal al amparo de la Regla 188(a) de Procedimiento Criminal, y la jurisprudencia de este Tribunal[7], a los fines de determinar la admisibilidad o no de la evidencia propuesta por

---

[5] Emitida por una Sala Especial integrada por el Juez Asociado señor Negrón García, como Presidente, y los Jueces Asociado señores Hernández Denton y Corrada del Río.

[6] Incluyendo los procedimientos relacionados con la citación del ex-investigador especial del Senado, el Lcdo. Héctor Rivera Cruz a comparecer a la vista ante el Comisionado Especial en el caso de autos, la cual dio lugar a la Opinión

**continúa...**

[6] **...continuación**
de este Tribunal de 18 de octubre de 1999. Véase *In re: Ángel Figueroa Vivas*, 99 JTS 164.

[7] Véase escolio 3, ante.

el Peticionario. Ello requiere, según antes indicado, que (i) la evidencia no pudo descubrirse con razonable diligencia antes del juicio, (ii) no es prueba acumulativa, (iii) no impugna la prueba aducida durante el juicio, (iv) es de naturaleza creíble y (v) probablemente produciría un resultado diferente, aparte de que sea pertinente y cumpla con las Reglas de Evidencia.

A la luz de las normas expuestas, el Comisionado Especial, en su Resolución de 25 de agosto de 1998, según enmendada, evaluó la evidencia propuesta por el Peticionario que fuera objetada por el Procurador General. Hemos examinado detenidamente las determinaciones del Comisionado Especial sobre cada una de las piezas de evidencia en cuestión y encontramos que las mismas están correctamente fundamentadas. Por consiguiente, ratificamos dichas determinaciones sobre la admisibilidad de la evidencia.[8]

III

Pasamos a considerar el Informe del Comisionado Especial presentado a este Tribunal el 22 de junio de 2001 y la Réplica del Peticionario de 13 de agosto de 2001.

La vista evidenciaria de la procedencia de la solicitud de reapertura del Peticionario se efectuó los días 23, 24 y 25 de marzo, el 8 de abril y el 9 de diciembre de 1999. El Peticionario presentó prueba documental y testifical.[9]

El Comisionado Especial formuló sus determinaciones de hechos[10] las cuales incluimos a continuación *verbatim*:

**"I. Determinaciones de hechos:**

**1.** La alegación del Peticionario de ocultación de prueba por parte del Estado se refiere principalmente a la depositada en la Oficina de Archivo del Senado. El resultado de la evidencia presentada en la vista de la Solicitud de Reapertura describe de la siguiente manera las circunstancias acontecidas al respecto: Durante la investigación original de los sucesos del Cerro Maravilla que realizara la Comisión de los Jurídico del Senado, la misma tenía aprobado una reglamentación mediante la cual se reguló el acceso público de los documentos que eran objeto de su examen. Según esa reglamentación el acceso público a los documentos dependía que fueran presentados en las vistas públicas que conducía o

_____

[8] Véase Resolución de 25 de agosto de 1998, según enmendada por la Resolución Nunc Pro Tunc, págs. 8 a la 49.

[9] Una relación de la prueba documental del Peticionario admitida en evidencia consta en las páginas 2 y 3 del Informe del Comisionado Especial. Además declararon nueve testigos, así como el Peticionario. Véase pág. 4 del Informe.

que hubiese acuerdo de dicha comisión autorizando su entrega. Esto respondió a la inquietud de dicho cuerpo legislativo de que el acceso público a la prueba interferiría con la investigación que llevaba a cado la Unidad de Investigaciones del Senado y por ello se mantenía el carácter confidencial de los documentos. Con motivo de esta situación surgió confrontación entre la Unidad de Investigaciones y la Oficina del FEI que interesaba acceso a los documentos. Durante la etapa en que la Unidad de Investigaciones era dirigida por el Lcdo. Demetrio Arus Cancel la Oficina del FEI no tenía acceso a los documentos excepto que se diera cualquiera de las dos situaciones expuestas de que se tratara de documentos sometidos en vista pública o porque la Comisión de lo Jurídico lo autorizara mediante acuerdo mayoritario.

**2.** En septiembre 86 la Unidad de Investigaciones pasó a cargo del Lcdo. Edgardo Pérez Viera en sustitución del Lcdo Arus Cancel. A partir de entonces y durante los años 87 y 88 el Senado flexibilizó la práctica sobre el acceso de documentos confidenciales a la Oficina del FEI. Motivó este cambio la percepción de los Presidentes del Senado y la Comisión de lo Jurídico de que, además de la necesidad que existía de proteger la investigación Senatorial que se efectuaba, no debían obstaculizar la que condujese la Oficina del FEI, organismo de creación legislativa. Por ello se dispuso un procedimiento para atender solicitudes para el examen de documentación por parte de la Oficina del FEI. Esta se hacía por escrito con indicación del documento que se interesaba examinar y mantenía un registro al efecto. La solicitud para el examen de documentos era hecha por la Oficina del FEI sobre la base de una lista-inventario de la prueba existente en la Oficina de Archivo del Senado. A pesar

---

[10] Véase Informe, págs. 4 a la 32.

de ello, de la prueba presentada no surge documento o prueba específica que fuera objeto de examen por los abogados de la Oficina del FEI. Tampoco se presentó evidencia del conocimiento de prueba concreta alguna que tuviera la Oficina del FEI de la que se encontraba en la Oficina de Archivo del Senado. El Peticionario alega el conocimiento general de esa prueba por parte de la Oficina del FEI. Fundamenta esta alegación en el acceso que describe el Lcdo. Pérez Viera se diera a los abogados de la oficina del FEI. Este acceso a examinar la prueba extendido al FEI, aunque limitado, no estuvo disponible a la defensa de los Policías acusados criminalmente por sus participaciones en los sucesos del Cerro Maravilla. De la prueba no surge que alguno de los querellados del procedimiento de desaforo presentase algún requerimiento para el examen o producción de prueba ante el Senado o la Comisión de lo Jurídico. Sin embargo, examinado en su contexto total el testimonio del Lcdo. Pérez Viera estimamos que se les hubiese extendido un trato similar que al de dichos policías.

3.     El Peticionario limitó su requerimiento de prueba a la que surge de la Moción del 2 de febrero 87 que presentara ante el Comisionado Especial. Alega al presente como razón para no haber hecho alguna otra gestión el resultado de la Resolución del Tribunal Supremo del 22 de mayo 84 en el caso Juan Corchado Juarbe, etc., Peticionario-apelante v. Hon. Francisco Aponte Pérez, Presidente de la Comisión de lo Jurídico, Senado de P.R., etc. Demandados-apelados, núm. O-84-266, sobre Sentencia Declaratoria, Injunction, etc. Expone su opinión que **[sic]** de que esa resolución representaba el estado de derecho y que bajo la misma el Senado no venía obligado a entregar prueba que no se hubiese hecho pública a personas que la requirieran.

**4.**     La siguiente porción del testimonio del Lcdo. Pérez Viera explica las circunstancias en que tuvo lugar el acceso al FEI de los documentos en la Oficina de Archivo del Senado y la manera en que el mismo se condujo:

"LCDO. EDGARDO PEREZ VIERA:
     ...Entonces este procedimiento, había una oficina que tenía espacio, especialmente una oficina que estaba al lado. Déjeme explicarle. Donde yo trabajaba era una oficina con un área, que tenía un área especial, que nosotros le llamábamos la pecera, que era un área de cristal, que era donde se hacían las entrevistas y estaba preparada por cuestiones de efectividad del sonido, y era una mesa de conferencia grande que allí era donde usualmente se tomaban las declaraciones juradas mientras yo estuve allí. Las que yo hacía allí. Al lado de esa área, había un área, que era como de este largo, de aquí hasta la pared, o menos. Tenía una puerta que estaba completamente cerrada. Esa era el área donde estaban las cajas fuertes y en esa estaban las declaraciones juradas y estaba la información confidencial, en ese lugar. La única persona que tenía acceso a eso era yo o cualquier persona que yo designara y le diera permiso para entrar allí, pero tenía que ser personal, las instrucciones eran bien precisas sobre eso. Lo que se hacía era que el Fiscal Especial decía yo quiero tal declaración. Entonces lo que se hacía era se sacaba, usualmente o era yo o era una de mis secretarias, por mi instrucción se sacaba el original de la transcripción, que era lo que usualmente no había copia y se llevaba a ese lugar de la oficina o yo, o mi secretaria, o un investigador o cualquier otro personal de la oficina, se quedaba enfrente del investigador o el abogado de la Oficina del Fiscal Especial Independiente que estaba observando ese documento.

LCDO. SANTIAGO RIVERA:
     Qué podría hacer ese fiscal o ese investigador del FEI con el documento allí?

LCDO. EDGARDO PEREZ VIERA:
     Leerlo.

LCDO. SANTIAGO RIVERA:
     Leerlo?

LCDO. EDGARDO PEREZ VIERA:
  No lo podía copiar.

LCDO. SANTIAGO RIVERA:
  No lo podía copiar? Podía tomar notas independientes?

LCDO. EDGARDO PEREZ VIERA:
     Si, como no.

LCDO. SANTIAGO RIVERA:
     Tomar nota. Tenía alguna limitación en términos del tiempo al examen del documento?

LCDO. EDGARDO PEREZ VIERA:
     No, podía examinarlo. Ellos usualmente, bajo unas circunstancias no les gustaban estar mucho tiempo

allí. De hecho, mi recuerdo es, que en esos primeros dos años, dos a tres años, 1986, 1987, 1988, las ocasiones que ocurrió eso fueron pocas." (págs. 299-300, T.E., vista 24 de marzo 99).

**5.** En su testimonio en la vista de la Solicitud de Reapertura el Peticionario hizo alusión a varios documentos cuya admisión en evidencia fuera denegada mediante la Resolución del Comisionado Especial del 25 de agosto 98. De su testimonio como del resto de la evidencia presentada se demostró que no llevó a cabo gestión otra alguna para obtener la prueba en que fundamenta la Solicitud de Reapertura que aquella que originó la Orden del Comisionado Especial del 9 de febrero 87 la cual dispuso ordenar al FEI que le entregase a todos los querellados del proceso de desaforo aquella prueba en su poder que tuviese carácter exculpatorio o favorable.

**6.** El Peticionario alegó la existencia de prueba que considera le hubiese permitido controvertir e impugnar la que sirvió de base al Tribunal Supremo para las determinaciones de hechos relacionadas con su intervención en los interrogatorios efectuados al Pol. J. Quiñones los días 17 y 26 de agosto 78. (Véase, las determinaciones de hechos a las páginas 54 a 60 de la Opinión del Tribunal Supremo en autos del 21 de febrero 91, en Pedro Colton Fontán, et als, CE-86-666.) [11] Esa prueba consiste de los testimonios prestados en la vista de la Solicitud de Reapertura por los testigos Julio César Andrades Cepeda, Teresa García Torres y el Lcdo. Michael Corona Muñoz y de los siguientes documentos: (En toda referencia y relación que hagamos de la prueba documental aducida por el Peticionario la identificamos con el número a su izquierda asignado por las partes al apartado II. A, a las páginas 5 a 10 del Informe Conjunto.

---

[11] Toda cita o referencia en el Informe del Comisionado Especial a la Opinión de este Tribunal en el caso *In re Colton Fontán*, supra, se

7.-(pág. 76 de declaración jurada del Pol. J. Quiñones el 15 de agosto 78 ante el Lcdo. Alvarado Santos.)
15.-(págs. 1, 27, 28 y 29 de declaración prestada por el Pol. J. Quiñones y su esposa Betzaida Velázquez el 28 de junio 91 ante la Lcda. Marta Vera)
48.-(declaración jurada del Pol. J. Quiñones del 15 de abril 86 ante el FEI
67.-(deposición del Pol. J. Quiñones del 20 de junio 80 en el caso Civil 79-236, Soto v. Romero ante el Tribunal de Distrito Federal de San Juan)

7.      Julio César Andrades fue asignado y se desempeñó como parte del operativo de los sucesos del Cerro Maravilla mientras era Director de la Unidad de Arrestos Especiales de la Policía de Puerto Rico. Declaró haber acudido alrededor de las 10:00 am del 17 de agosto 78 a la Oficina del Fiscal Colton Fontán de Investigaciones Criminales, localizada entonces en edificio frente a la YMCA de San Juan, previa citación que le hiciera el Agente William Rodríguez Suárez, con el fin de prestar declaración sobre su participación en los sucesos del Cerro Maravilla. Expuso que tan pronto llegó, Rodríguez Suárez le hizo pasar a la oficina del Fiscal Coltón [sic] donde él se encontraba y se interrogaba al Policía Jesús Quiñones; que entró a esa oficina en el preciso momento en que el Fiscal Coltón [sic] interrogaba al Pol. Quiñones y éste respondía haber escuchado dos ráfagas de disparos del Cerro Maravilla contra la posición de dicho fiscal de que sólo ocurriera una ráfaga. Indicó Andrades que surgió una polémica entre ambos sobre ese extremo y observó una actitud hostil del Fiscal Colton hacia el Pol. Quiñones, habiéndole increpado de palabras y en forma violenta golpeado fuertemente con el puño sobre el escritorio lo que puso nervioso a este último. Andrades expuso, además, que en esas condiciones de hostilidad demostrada hacia el Pol. Quiñones, optó por

refiere a la que obra en los autos del caso CE-86-666 y no a 128 D.P.R. 1.

retirarse de ese lugar. Expresó al efecto que estuvo en esa oficina en que se interrogaba al Pol. Quiñones entre 5 a 6 minutos sin que durante ese tiempo observara en la misma la presencia del Peticionario.

8. Andrades declaró que posteriormente renunció a la Policía de Puerto Rico y se trasladó a Orlando, Florida donde quedó bajo el control de un programa de protección de testigos por parte del Negociado Federal de Investigaciones (FBI). Indicó que allí fue entrevistado en más de una ocasión por funcionarios del FEI y por el designado por el Senado de Puerto Rico para investigar los sucesos del Cerro Maravilla; que la primera de esas entrevistas ocurrió a mediados de 1987 siendo entrevistado por los representantes legales del FEI, el Lcdo. Alejandro Salgado y la Lcda. Jocelyn López Vilanova; además, que en esa ocasión declaró a esas personas la misma versión antes indicada. (págs. 74-80, T.E. vista del 23 de marzo 99 ante el Comisionado Especial)

9. El 8 de febrero 96 Andrades prestó declaración ante la Lcda. Milka Marrero a quien también expuso igual versión. Para esta fecha él se encontraba encarcelado cumpliendo condena por delito de homicidio cometido el año 1976.

10. El hecho que Teresa García Torres testificara en la vista de la Solicitud de Reapertura permite que evaluemos por sí mismo el contenido de su testimonio y el significado que tiene en relación los méritos de esa solicitud. Esto hace académica la consideración en reconsideración de los documentos de sus declaraciones que aparecen bajo los números **4** (del 7 de septiembre del 8 de septiembre 81 ante el Lcdo. H. Rivera Cruz), **39** (del 16 de julio 86 ante la Lcda. Maricarmen Ramos de Szendrey) y **78** (b), apartado II del Informe Conjunto de Conferencia.

**11.**    Tomamos conocimiento que en la vista de desaforo Teresa García fue anunciada como testigo del Peticionario quien luego optara por no presentarla. (Véase, el apartado 1(b) de la Moción del Peticionario (entonces querellado) del 2 de febrero 87.) No surge de los autos la razón para esta decisión. En estas circunstancias fue llamado a declarar como testigo del querellado Colton Fontán.

**12.**    Para la fecha del 26 de agosto 78 Teresa García se desempeñaba en la Oficina del Negociado de Investigaciones Especiales del Departamento de Justicia (NIE) como Secretaria del Director Auxiliar de la misma. A partir de 1982 pasó a ser Agente en esa oficina. Según su testimonio, el sábado 26 de agosto 78 el Peticionario la recogió en su vehículo en su hogar para dirigirse a Ponce en helicóptero acompañado del querellado Colton Fontán. El Peticionario conocía la localización de su hogar ya que en ocasiones la transportaba al mismo en su vehículo en regreso del trabajo. Esa mañana irían a tomarle declaración al Policía Quiñones en el hogar de éste en Ponce.

Al llegar a Ponce les esperaban los agentes del NIE, José Romo Matienzo y Rodríguez Suárez, dirigiéndose todos en automóvil hasta la residencia del Pol. Quiñones. En el área de esa residencia, Teresa García permaneció dentro del automóvil el que se dejó estacionado afuera en la calle mientras los demás entraron a la residencia del Pol. Quiñones; primero lo hicieron los agentes y después Colton y el Peticionario. Mientras tanto, Teresa García se mantuvo dentro del vehículo en espera que se le avisara para entrar a la casa. A pesar que fue evasiva en precisar el tiempo que estuvo afuera antes de entrar, indicó que permaneció en esa espera unos veinte minutos en un contexto que no excluye que fuera un tiempo mayor (págs. 392-93, T.E., vista 24 de marzo 99) Luego que

Teresa García entró a la residencia del Policía Quiñones transcribió allí la declaración que éste prestara en esa ocasión. Ella expresa que la declaración jurada se tomó esa mañana se tomó en un ambiente de tranquilidad y sin que delante de ella ocurriera discusión entre el Peticionario y el Policía Quiñones.

13. Teresa García prestó testimonio al efecto antes expresado al Investigador del Senado Lcdo. Rivera Cruz y a los representantes legales de la Oficina del FEI, Lcda. Maricarmen Ramos de Szendrey, Lcda. J. López Vilanova y Lcdo. Efraín Meléndez. Se refirió a la respuesta que le diera entonces a ella la Lcda. Ramos de Szendrey de que tenía testimonio que indicaba lo contrario; también, a que el Lcdo. E. Meléndez, ya fallecido, diera un puño sobre la mesa cuando le interrogaba, lo que interpretó como amenaza.

14. El Lcdo. Michael Corona Muñoz fue designado Investigador de Comisión Especial del Senado para llevar a cabo la investigación de la que hiciera la Comisión de lo Jurídico de anterior Senado de los sucesos del Cerro Maravilla durante el período de 1982 a 1992 y asimismo de la que realizara el FEI. Antes de recibir esa encomienda el Lcdo. Corona Muñoz se desempeñaba como Sub-Director de la División de Crimen Organizado y Drogas del Departamento de Justicia mientras era dirigida por el Lcdo. Andrés Rodríguez Elías. A tenor con esa encomienda su trabajo comprendió la realización de un análisis comparativo de las distintas declaraciones juradas habidas y la toma de nuevas declaraciones juradas de los participantes en dichos eventos. El grueso de la labor a realizar consistiría en examinar, estudiar y evaluar lo que ya estaba. (pág. 578, T.E., vista 8 de abril 99) Por el trabajo demostrado, el cual surge de la prueba de su testimonio, esa encomienda incluyó el examen y evaluación por parte del Lcdo. Corona Muñoz de la

prueba sobre la que el Tribunal Supremo fundamentó sus determinaciones y conclusiones y la Sentencia de desaforo emitida en In re: Pedro Colton Fontán, et als, CE-86-666. Según el testimonio del Lcdo. Corona Muñoz, conforme a la evaluación que hiciera, es su opinión que las declaraciones juradas prestadas por Teresa García y Carmen Aledo ante el Lcdo. H. Rivera Cruz el 8 de septiembre 81 desmienten la coacción de que fuera objeto el Pol. Quiñones en las ocasiones que prestara declaraciones juradas los días 17 y 26 de agosto 78 según así lo determinara el Tribunal Supremo. (Véase, esas determinaciones a las páginas 54 a 60 de la Opinión del Tribunal Supremo.) El Lcdo. Corona Muñoz expresó esta opinión a pesar que al ser inquirido al efecto admitió ignorar lo que Teresa García y Carmen Aledo testificaran en la vista de desaforo. A continuación la parte de su testimonio en la vista de la Solicitud de Reapertura que informa este extremo:

"LCDA. RODRIGUEZ BENITEZ:
En su opinión, estoy correcta y entiendo que usted lo que opina es que el testimonio de Carmen Aledo y de Teresita García desmienten el testimonio de, impugna el testimonio de Jesús Quiñones.

LCDO. MICHAEL CORONA MUÑOZ:
Es correcto.

LCDA. RODRIGUEZ BENITEZ:
Oigame, conoce usted si Carmen Aledo testificó durante el proceso disciplinario frente a este Tribunal?

LCDO. MICHAEL CORONA MUÑOZ:
Si, testificó. **Eso es lo que tengo entendido.**

LCDA. RODRIGUEZ BENITEZ:
**Conoce usted cuál fue el testimonio de Carmen Aledo ante este Tribunal durante el proceso disciplinario?**

LCDO. MICHAEL CORONA MUÑOZ:
**No, no he tenido oportunidad de examinar eso.**

LCDA. RODRIGUEZ BENITEZ:
**O sea, usted no sabe qué diferencia puede existir entre lo que dijo Carmen Aledo aquí en el 1984 y lo que dijo en el 1982, que exista alguna diferencia, eso no lo puede determinar.**

LCDO. MICHAEL CORONA MUÑOZ:

**No, no he examinado lo que declaró aquí.** Examiné otros documentos, testimonios de... pero no el particular que usted me está diciendo.

LCDA. RODRIGUEZ BENITEZ:
Y le pregunto si usted conoce si Teresita García testificó durante el proceso disciplinario?

LCDO. MICHAEL CORONA MUÑOZ:
Ella indicó en la vista pública, a preguntas mías, que sí, que había testificado.

LCDA. RODRIGUEZ BENITEZ:
Que había testificado. Oigame, digame si es o no cierto, que en esa vista pública ella testificó, le dijo a usted que lo que ella había dicho en el 1981 a Rivera Cruz, lo que había dicho al FEI, lo que había dicho durante el proceso disciplinario, lo que siempre había dicho en los distintos procesos había sido lo mismo.

LCDO. MICHAEL CORONA MUÑOZ:
No, yo no recuerdo esa parte.

LCDA. RODRIGUEZ BENITEZ:
No recuerda esa parte. **Y usted tampoco no sabe si lo que dijo Teresita García durante el proceso disciplinario que se llevó contra los cinco fiscales es igual a lo que ella dijo en el 1981?**

LCDO. MICHAEL CORONA MUÑOZ:
**En cuanto a lo que dijo ante el Foro aquí, no. Yo tengo conocimiento de otros Foros."** (págs. 615 y 616, T.E., vista del 8 de abril 99)

15.     Para la fecha de los sucesos del Cerro Maravilla, Carmen Aledo era la Secretaria del Peticionario como Director del NIE. Cada una de ellas prestó declaración jurada ante el Lcdo. Rivera Cruz como Investigador de los sucesos del Cerro Maravilla para la Comisión de lo Jurídico del Senado. El Peticionario testificó en la vista de la Solicitud de Reapertura que para la investigación de dichos sucesos conocía que ambas fueron citadas por dicho investigador pero que desconocía que ellas hubiesen prestado declaración alguna ante dicho funcionario. Afirmó que no fue hasta 1994 que advino en conocimiento de ello a través del Informe rendido por el Lcdo. Nelson Martínez Acosta al respecto. No obstante, en esa expresión el Peticionario no expone la verdad de lo acontecido. La realidad es que conocía desde el 2 de febrero 87 cuando menos que Carmen Aledo había prestado declaración

jurada ante el Lcdo. H. Rivera Cruz el 8 de septiembre 81. En esa fecha él radicó "Moción" ante el Comisionado Especial, durante el procedimiento de descubrimiento de prueba que antecedió al proceso de desaforo, en la que solicitó que se le suministrara, "[d]eclaración Jurada de la Señora Carmen Aledo, de fecha 8 de septiembre de 1981, prestada ante el Lic. Héctor Rivera Cruz." (párr. 3(b), a la pág. 2-3 de esa moción) Véase, al respecto, el resultado siguiente de su testimonio directo y del contrainterrogatorio:

LCDO. HECTOR SANTIAGO RIVERA:
   A qué otra prueba de evidencia, usted señala, que usted utilizó para solicitar esta reapertura que no tuvo disponible en el proceso?

SR. ANGEL FIGUEROA VIVAS:
   Hubo una declaración, una copia de una declaración que recibí del Lcdo. Martínez Acosta, donde hacía una relación de las declaraciones que habían prestado la joven Teresa García y Carmen Aledo, en ese entonces, y señalaba de que no hubo irregularidad alguna en el proceso que se llevaron a cabo cuando se entrevistó al Sr. Jesús Quiñones Quiñones.

LCDO. HECTOR SANTIAGO RIVERA:
   De qué fecha estamos hablando, Sr. Figueroa?

SR. ANGEL FIGUEROA VIVAS:
   **Esto fue para el 1994**. Entonces, yo procedí a mostrarle la copia al propio Lcdo Nelson Martínez Acosta y entonces él reconoció que sí ese informe él lo había preparado y reconoció su firma, y entonces ese fue otro de los documentos que se utilizaron para esa petición de reapertura que se hizo ante el Honorable Tribunal Supremo en el 1994.

LCDO. HECTOR SANTIAGO FIGUEROA:
   Qué relación tiene Nelson Martínez Acosta con estas dos damas que usted mencionó, de acuerdo a ese documento que usted mencionó?

SR. ANGEL FIGUEROA VIVAS:
   La Sra. Carmen Aledo era Secretaria de este servidor en el Negociado de Investigaciones Especiales cuando se intervino con el Sr. Jesús Quiñones el 17 de agosto de 1978 y además, Teresa García era secretaria del Negociado de Investigaciones y fue la persona que tomó, actuó como secretaria para tomar la declaración en su casa el 26 de agosto de 1978.

LCDO. HECTOR SANTIAGO FIGUEROA:
   Qué relación tiene Nelson Martínez Acosta con estas dos damas que usted mencionó, de acuerdo a ese documento que usted mencionó?

SR. ANGEL FIGUEROA VIVAS:
   La Sra. Carmen Aledo era Secretaria de este servidor en el Negociado de Investigaciones Especiales cuando se intervino con el Sr. Jesús Quiñones el 17 de agosto de 1978 y además, Teresa García era secretaria del Negociado de Investigaciones y fue la persona que tomó, actuó como secretaria para tomar la declaración en su casa el 26 de agosto de 1978.

SR. ANGEL FIGUEROA VIVAS:
   Tanto Carmen Aledo como Teresa García.

LCDO. HECTOR SANTIAGO RIVERA:
   Relacionado con qué?

SR. ANGEL FIGUEROA VIVAS:
   Relacionado con el conocimiento que tenían sobre los hechos de la intervención con el Sr. Quiñones; y estas declaraciones no fueron transcritas cuando se tomaron. O sea, se tomaron el 8 de septiembre de 1981 y no fueron transcritas hasta el 1995. Y cuando se encontró el "cassette", se localizó, que decía en la parte escrita "void", que estaban dañadas.
.....
LCDO. HECTOR SANTIAGO RIVERA:
   Usted dice que obtuvo conocimiento de la existencia de esta declaración en el año 1995?

SR. ANGEL FIGUEROA VIVAS:
   Bueno, de la existencia de que se había, de la certeza que se había tomado con el informe del Lcdo. Nelson Martínez, **yo tengo conocimiento de que sí, esas declaraciones se tomaron**. Si existían o no físicamente, del testimonio de plasmar una declaración, pues, no sabía verdaderamente. Cuando lo vengo a saber es para fines de 1995.

LCDO. HECTOR SANTIAGO RIVERA:
   Para cuando tuvo conocimiento de la existencia que se habían prestado?
SR. ANGEL FIGUEROA VIVAS:
   Que se habían prestado?

LCDO. ANGEL FIGUEROA VIVAS:**[sic]**
   Si. Cuándo usted menciona por Nelson Martínez Acosta, de qué fecha estamos hablando?

SR. ANGEL FIGUEROA VIVAS:
   **Estamos hablando de 1994**. Pero qué ocurre? Uno tenía conocimiento cuando ellas fueron citadas ante el Lcdo. Héctor Rivera Cruz. **Sabía que habían sido citadas, desconocía si habían prestado declaración. Ahora, la certeza de que habían prestado la declaración surge para el 1994**. (págs. 16 a 19, T.E., vista 9 de diciembre 99)
.....

"LCDA. EDNA S. RODRIGUEZ BENITEZ:
   Desde los inicios de estos procedimientos usted solicitó la declaración de Carmen Aledo y de Teresa García ante Rivera Cruz del 8 de septiembre, con nombre, apellido y fecha, lo que implica que usted tenía el conocimiento desde allá, para el 30 de mayo de 1987, que esas

declaraciones estas personas la habían prestado ante Rivera Cruz. Esto y correcta?

SR. ANGEL FIGUEROA VIVAS:
Yo, lo que estaba seguro era que ellas habían comparecido, que habían sido citadas ante el Licenciado Rivera Cruz, **pero de constarme de que había prestado una declaración como tal per se, o sea, constarme, de hecho cierto, no tengo."** (págs. 85-86, T.E., vista del 9 de diciembre 99)

16.     El Peticionario alega también en apoyo de la Solicitud de Reapertura contra las determinaciones de la existencia de hematomas en los rostros de los jóvenes que hiciera el Tribunal Supremo. (Véase, a las páginas 126 a 128 de la Opinión del Tribunal Supremo.) La prueba para intentar sustanciar esta alegación consiste de su propio testimonio, el del Lcdo. M. Corona Muñoz y de las declaraciones de los patólogos que alega no le fue suministrada. A continuación las páginas de las declaraciones de los patólogos y las declaraciones completas de estos a las que se refirió:

.17 - (págs. 20 y 21 de la declaración jurada del Dr. J. Ramos Rivera del 13 de agosto 81 ante el Lcdo. H. Rivera Cruz)
.18 - (págs. 58 y 59 de la declaración jurada del Dr. R. Críado del 15 de febrero 83 ante el Lcdo. H. Rivera Cruz)
.32 - (declaración jurada del Dr. R. Rigal del 7 de septiembre 81 ante uno de los abogados del FEI que no informa la prueba)
.34 - (declaración jurada del Dr. Críado del 4 de diciembre 86 ante el Lcdo. William Fred Santiago)

16.[sic] Tomamos conocimiento que en la Moción indicada del 2 de febrero 87 del procedimiento de desaforo el Peticionario anunció al Dr. René Rigal entre los testigos a presentar. (Véase, el apartado 1(d) de dicha moción) por razones que no se explica en la prueba, el Peticionario no llegó a presentar este testigo.)

17.     En su testimonio en la vista de la Solicitud de Reapertura el Peticionario expuso como razón para presentar las declaraciones de los patólogos referidas, su propósito de demostrar la condición de los cadáveres como prueba

impugnatoria contra las mencionadas determinaciones del Tribunal Supremo de la existencia de marcas y hematomas en los rostros de los jóvenes muertos. Afirmó al efecto que es luego de dar lectura a estas declaraciones que recuerda que consisten de las mismas versiones sobre la condición en que quedaron los rostros de los jóvenes que esos mismos facultativos le dieran a él en su investigación de los sucesos del Cerro Maravilla y las cuales fueron recogidas en el Informe Coltón-Figueroa **[sic]** del 29 de agosto 78 y sirvió de fundamento al mismo. En estas circunstancias el Peticionario considera que el FEI realizó su investigación en un marco de referencia distinto al de esas declaraciones de los patólogos y objeta la determinación del Tribunal Supremo de haber apreciado la existencia de golpes y hematomas con sólo mirar las fotografías. Para una mejor comprensión de la posición del Peticionario aquí descrita, exponemos a continuación la parte de su testimonio al respecto en la vista:

"LCDO. HECTOR SANTIAGO RIVERA:
 Señor Figueroa, cuando la compañera Procuradora le estaba preguntando a usted, específicamente sobre las declaraciones del Dr. Críado, Ramos y Rigal...[u]sted hizo una expresión a una pregunta de la compañera, **que estas declaraciones tomadas por el compañero Rivera Cruz corroboraban parte de una versión que estas personas le dijeron cuando usted hizo la investigación.**

SR. ANGEL FIGUEROA VIVAS:
 <u>Así es.</u>

LCDO. HECTOR SANTIAGO RIVERA:
 Y usted comenzó una frase, pero, y ahí fue que la compañera le hizo otra pregunta.

SR. ANGEL FIGUEROA VIVAS:
 Entonces, qué ocurre, durante el, cuando me formulan los cargos y se ve la vista ante el Honorable Comisionado, **estas declaraciones no estuvieron a mi disposición a los fines de uno poder entonces, hacer la determinación, utilizarlas verdaderamente;** porque entendía de que dentro de una apreciación o sea de la prueba, pero que entendía definitivamente el contenido era altamente a uno.

LCDO. HECTOR SANTIAGO RIVERA:
 **En qué hubiera beneficiado la utilización de estas declaraciones juradas en la vista de desaforo?**

SR. ANGEL FIGUEROA VIVAS:
En base, los cargos formulados, o sea, respecto a la investigación como una investigación deficiente totalmente. **La situación es que el informe recogía todo lo que los testigos, las declaraciones, lo que los testigos habían señalado. Luego cuando hace el FEI la investigación es otro marco de referencia; otros testigos, o sea, otras versiones y entonces esas declaraciones que ellos le toman a estos peritos, el Dr. Rigal, el Dr. Ramos y el Dr. Críado,** esos en particular, o sea tanto tomadas por el Lcdo. Rivera Cruz, como las tomadas por el FEI, no las pusieron a disposición de uno. momento para su versión, para su defensa? **[sic]**

LCDO. HECTOR SANTIAGO RIVERA:
En qué beneficiaba que usted tuviera disponibles esas declaraciones juradas en ese momento para su versión, para su defensa?

SR. ANGEL FIGUEROA VIVAS:
**Fíjese, hay una determinación que hace el Honorable Tribunal Supremo en relación a las fotografías de uno de los occisos, que señalaba que con mirarlo únicamente se podía determinar que había tenido golpes, o sea, que tenía hematomas.** Y entonces, qué ocurre, el propio Héctor Rivera Cruz como el FEI, cuando entrevista al Dr. Críado, le presenta la fotografía y él hace su determinación, y él señala específicamente de que no había golpes, hematomas, que no había encontrado hematoma alguna. Era fundamental, o sea, esas declaraciones. Y entonces, el Dr. Ramos, de igual forma, cuando le pregunta al Lcdo. Rivera Cruz le pregunta a él sobre lo que él observó, o sea, **él hace la narración en una forma que era compatible con el primer informe, pero no así con el informe que rindió el FEI,** o sea, que toma entonces las determinaciones en contra de mi persona.

LCDO. HECTOR SANTIAGO RIVERA:
Y en cuanto al Dr. Rigal?

SR. ANGEL FIGUEROA VIVAS:
**El Dr. Rigal igual, en la misma forma porque él fue que hizo las autopsias y él narra entonces, en la declaraciones entonces que yo pude percatarme, la que mismo le tomé a él específicamente, que entonces estaba atachada a la declaración del 7 de septiembre de 1981, entonces qué ocurre, cuando la leo, entonces refresco la memoria y veo que le hice preguntas específicas sobre golpes, que si había observado golpes como tal. Y entonces él me dio respuestas categóricas. En unas respuestas categóricas, o sea, que lo que surgía del informe, eso era lo que había. Ante una situación de esa naturaleza, pues, qué ocurrió, el informe recogió la versión esa. Pero esa versión, definitivamente, no encajaba en la versión entonces del FEI** una vez que, entonces, otros testigos han declarado otras cosas y han cambiando entonces, por diferentes motivaciones, o sea, cambiaron la teoría propiamente.

LCDO. HECTOR SANTIAGO RIVERA:

Le pregunto, cuando usted se entrevistó bajo juramento por el FEI; se le preguntó por esa área de los cuerpos, de las víctimas?

SR. ANGEL FIGUEROA VIVAS:
Del recuerdo que tengo, por lo menos en forma detallada asi**[sic]** no tengo recuerdo específico como que haya entrado en un área determinada.

LCDO. HECTOR SANTIAGO RIVERA:
Se hizo alguna referencia por el FEI a las declaraciones prestadas por esos tres médicos?

SR. ANGEL FIGUEROA VIVAS:
Definitivamente, en ninguna forma me mencionaron que ellos había prestado declaraciones que tenían. Yo desconocía. Esa entrevista, fíjese, que cuando a mí me toman la declaración el FEI, **fue para el 1985, que se me tomó a mí; al Dr. Críado se la toman el 4 de diciembre de 1986, que es con posterioridad, o sea, que no estaba disponible al momento que me toman a mí la declaración.**"
(págs. 107 a 110, T.E., vista 9 de diciembre 89)

**18.** En su testimonio el Lcdo. Corona Muñoz también expresó su objeción a la determinación del Tribunal Supremo en la sentencia de desaforo de apreciar "hematomas" en los rostros de los jóvenes por el examen de las fotos de los cadáveres. (Véase, las determinaciones que exponen el resultado de la apreciación de las marcas en los rostros y demás partes de los cuerpos que hace el Tribunal Supremo, a las páginas 126 y 127 de la Opinión.) El desacuerdo del Lcdo. Corona Muñoz radica en que entiende que no hay conformidad entre esa apreciación del Tribunal y declaraciones de peritos que a su juicio no habían salido a la luz pública al ventilarse la vista de desaforo y emitirse la Sentencia. Estas declaraciones de peritos a que alude son las de los Patólogos, Dres. Críado y Rigal. Sin embargo al ser confrontado por el Procurador General admitió que el Informe Colton-Figueroa del 29 de agosto 78 se fundamenta en testimonios de esos mismos peritos al efecto que ninguno de estos observara hematomas. Exponemos a continuación el testimonio en la vista del Lcdo. Corona Muñoz que expone su posición:

LCDO. SANTIAGO RIVERA:
    En particular le pregunto Licenciado, si usted realizó alguna reinvestigación o investigación de este caso en el área de las fotos?

LCDO. MICHAEL CORONA MUÑOZ:
    En el área de las fotos, una vez leo lo que dice este Honorable Tribunal en cuanto a cómo quedó el cadáver y de que surge que era obvio, no sé si esas son las palabras exactas que se usan, pero era...**De que una vez usted examina las fotos la persona tenía hematomas en la cara, me confronto con el problema de que tengo cuatro o cinco declaraciones de peritos que no salió a la luz pública que dicen que no ven hematomas.** Entonces, tengo que entrar en la pregunta, el Tribunal Supremo de Puerto Rico, al tomar su decisión de que esto era obvio, había examinado esto que yo estoy viendo en el Senado para llegar a esa conclusión." (pág. 601, T.E., vista 8 de abril 99)

                                    .....

"LCDA. RODRIGUEZ BENITEZ:
    Volviendo al informe Colton-Foltán.

LCDO. MICHAEL CORONA MUÑOZ:
    Si.

LCDA. RODRIGUEZ BENITEZ:
    Perdón, Colton-Figueroa, usted nos indicó que lo había leído.

LCDO. MICHAEL CORONA MUÑOZ:
    Lo leí.

LCDA. RODRIGUEZ BENITEZ:
    Y vio los anejos y los apéndices de ese informe?

LCDO. MICHAEL CORONA MUÑOZ:
    Si.

LCDA. RODRIGUEZ BENITEZ:
    **Los testimonios que en que se basaba ese informe, dígame si es o no cierto que son similares al testimonio que usted encuentra y que alega que no fueron transcritos ni hechos a la luz pública.**

LCDO. MICHAEL CORONA MUÑOZ:
    Verdaderamente no entiendo su pregunta.

LCDA. RODRIGUEZ BENITEZ:
    **Si lo que testifican los señores peritos que usted nos informa, el Dr. Rigal, el Dr. Críado, es lo mismo que está recogido en el Informe Colton-Fontán?**

LCDO. MICHAEL CORONA MUÑOZ:
    No, no es lo mismo porque lo que viene después es mucho más extenso y mucho más detallado. Si lo que está allí cuando se hace el informe de Colton es, bueno, lo que se puede hacer en un momento de investigación. Estamos hablando de tres, cuatro declaraciones juradas, algunas con cientos de páginas. Es una declaración mucho más detallada, declaraciones mucho más detalladas las que

se le toman por parte del Senado en cuanto a todos esos peritos. Así que, yo no diría que son lo mismo.

LCDA. RODRIGUEZ BENITEZ:
Pero es totalmente el mismo. Por ejemplo, éste concluye que allí no hubo hematomas.

LCDO. MICHAEL CORONA MUÑOZ:
**Es correcto en ese sentido que no hubo, que Críado no observó hematomas y que Rigal tampoco, eso es correcto. En ese sentido, pues si, eso es así.**" (pág. 650-651, T.E., vista 8 de abril 99)

19. El Peticionario presentó en la vista de la Solicitud de Reapertura los testimonios de los testigos, los agentes policíacos Miguel Cartagena Flores y Rafael Torres Marrero. En el propósito bajo el cual el Peticionario presenta esos testimonios, se relacionan entre sí. Cartagena Flores se retractó del testimonio que diera en la vista de desaforo como testigo presencial de las muertes a los jóvenes Soto Arriví y Darío Rosado en el lugar de las Torres Rikavisión del Cerro Maravilla. En este nuevo testimonio él se ubica completamente afuera de la escena cuando ocurrieron dichas muertes e intenta demostrar haber informado ello oralmente al Lcdo. Rivera Cruz durante el trámite que el propio Cartagena Flores solicitara que se le extendiese inmunidad penal para poder testificar. De acuerdo con esa solicitud le fue extendida inmunidad penal en las esferas federal y local. Evaluamos el presente testimonio de Cartagena Flores por su propio contenido lo que hace innecesario por académica la atención de la petición de reconsideración para admitir sus declaraciones juradas prestadas ante el Lcdo. Rivera Cruz que surgen de los números **19,** del 3 de octubre 83; **27** del 7 de febrero 83; **28** del 7 de noviembre 83 y **29** del 9 de noviembre 83 del Informe Conjunto de Conferencia.

20. Mediante el testimonio de Torres Marrero en la vista de la Solicitud de Reapertura el Peticionario intenta probar que Cartagena Flores no estaba en la escena de los asesinatos

cuando se produjo las muertes. De igual manera, evaluamos el testimonio de este testigo por su propio contenido lo cual hace innecesario por académico atender la petición de reconsideración de su declaración del 5 de septiembre 95 bajo el número **78(e)** del apartado II.A del Informe Conjunto.

De acuerdo al testimonio de Cartagena Flores, el 25 de julio 78 él transportó en vehículo de motor a los agentes policíacos, Angel Santiago y Pérez Casillas del Aeropuerto Mercedita de Ponce hasta el Cerro Maravilla. Antes de llegar al lugar preciso advirtió la presencia de los agentes Méndez y Carmelo Cruz quienes vigilaban la travesía del agente encubierto González Malavé, los jóvenes Carlos Soto y Arnaldo Darío Rosado y el rehén, J. Ortiz Molina. Luego de escuchar una primera ráfaga de disparos proveniente de las Torres de Rikavisión en el Cerro Maravilla por instrucciones de Pérez Casillas condujo al rehén hasta las Torres de la Policía custodiadas por el Pol. Jesús Quiñones. Afirmó la ocurrencia de una segunda ráfaga de disparos proveniente de las Torres de Rikavisión. Luego a requerimiento de Pérez Casillas, acompañado del agente policíaco Rafael Moreno Morales, transportó al cadáver de Soto Arriví hasta el Hospital del Pueblo de Jayuya.

21. En su testimonio en la vista de la Solicitud de Reapertura Cartagena Flores explica las circunstancias bajo las cuales se originó su anterior testimonio en la vista de desaforo. Indica que mientras era interrogado por el Lcdo. Rivera Cruz fue confrontado con su versión de los hechos y una discrepancia surgida entre las versiones de los agentes policíacos Torres Marrero y Mateo como resultado de lo cual, previa consulta con su abogado, él decidió decir la verdad. Expresa que ante el Lcdo. Rivera Cruz él condicionó decir esa verdad a que se le extendiese inmunidad en la esfera federal.

Por esta razón el Lcdo. Rivera Cruz le refirió ante el Fiscal Federal, Lcdo. Daniel López Romo quien a su vez condicionó a Cartagena Flores la concesión de la inmunidad solicitada a que pasara la prueba del polígrafo.

En las circunstancias acabadas de reseñar Cartagena Flores expresa que decidió declarar la verdad como un asunto de conciencia. Añade, sin embargo, que con el fin de poder lograr la concesión de la inmunidad, optó por ubicarse en el lugar donde se dio muerte a los jóvenes logrando así que se le extendiese la inmunidad interesada.

22. Cartagena Flores prestó entonces declaración jurada bajo inmunidad federal y luego local como testigo presencial con la versión que lo ubica en la escena de los crímenes cuando se dio muerte a los jóvenes. Dio esta versión como testigo en procedimientos penales ante diferentes foros, como el Gran Jurado Federal, el Tribunal de Distrito Federal para Puerto Rico, el Tribunal Superior de Puerto Rico en que se juzgó a los policías participantes de los sucesos del Cerro Maravilla, en Sesiones Ejecutivas y Públicas de la Comisión de lo Jurídico del Senado y en la vista de desaforo de los Fiscales que participaron en la investigación de los sucesos del Cerro Maravilla ante el Comisionado Especial. Como resultado de esos procedimientos policías participantes en dichos sucesos fueron convictos y encarcelados, incluyendo Torres Marrero, hermano de la esposa del propio Cartagena Flores, los cuales tomamos conocimiento que continúan encarcelados.

23. No obstante, en 1996 Cartagena Flores se retractó de su versión indicada en su comparecencia ante la Lcda. Nilka Marrero y luego ante el Lcdo. Corona Muñoz quien le sustituyó en la reinvestigación de los sucesos del Cerro Maravilla dispuesta por la Comisión Especial del Senado. En esta nueva

versión, que es igual a la expresa en su testimonio en la vista de la Solicitud de Reapertura, él indica que no estuvo en la escena del crimen en el momento de las muertes de los jóvenes. El aduce nuevamente como un asunto de conciencia la razón que lo motivó a cambiar su versión. La parte siguiente de su testimonio en la vista del presente caso describe en lo pertinente toda esta situación:

LCDO. SANTIAGO RIVERA:
  Cuando usted declara bajo inmunidad frente al Pueblo de Puerto Rico, y usted me corrije, usted fue el primer testigo que se acogió a la inmunidad del Senado?

TESTIGO MIGUEL CARTAGENA FLORES:
  Es correcto.

LCDO. SANTIAGO RIVERA:
  Cuando usted declara bajo inmunidad frente al Pueblo de Puerto Rico, frente a las cámaras, usted dio una versión de los hechos?

TESTIGO MIGUEL CARTAGENA FLORES:
  Yo di una versión de los hechos.

LCDO. SANTIADO RIVERA:
  Es igual a ésta que está dando aquí en el día de hoy?

TESTIGO MIGUEL CARTAGENA FLORES:
  No es igual.

LCDO. SANTIAGO RIVERA:
  En qué no es igual?

TESTIGO MIGUEL CARTAGENA FLORES:
  No es el igual en el sentido de lo que ocurrió en la escena, porque yo siempre le decía al Lcdo. Torres de la Cruz que yo no estaba en la escena, inclusive se lo dije a los federales. Pero el Gobierno Federal, el Lcdo. López Romo, me dice que la oferta de inmunidad es de que dijera, usted sabe, que tuviera que pasar el polígrafo. Una de las condiciones para concederme inmunidad era que tenía que pasar el polígrafo y yo como, pues, como **estaba, para mi conciencia estaba diciendo la verdad**, pues, no hay problemas, vamos para el polígrafo. Y allí fue que empezaron los problemas conmigo, no estaba pasando el polígrafo porque no estaba, me estaba saliendo de la extensión allí.

LCDO. SANTIAGO RIVERA:
  Según ellos?

TESTIGO MIGUEL CARTAGENA FLORES:
  Según el abogado mío también para aquel entonces, otro de los abogados, que falleció.

LCDO. SANTIAGO RIVERA:
  Félix Ortiz Juan?

TESTIGO MIGUEL CARTAGENA FLORES:
   Félix Ortiz Juan. (págs. 443 a 445, T.E., vista 24 de
   marzo 99)

                    .....

LCDO. SANTIAGO RIVERA:
   Testigo, finalmente, por qué usted rectificó su versión
   en el 1996 en relación a la que había prestado en el 1983?

TESTIGO MIGUEL CARTAGENA FLORES:
   "Porque yo sinceramente, siempre me he ocupado de decir
   la verdad y cuando **hay algo que le molesta a uno, uno
   debe rectificarlo. Y eso fue lo que me llevó a rectificar**
   lo que me constaba y lo que yo sabía de este caso. En
   aquel 1983 lo hice, pero no estaban conformes, querían
   que yo dijera otras cosas que no me constaban. Lo tuve
   que hacer por unas cosas que me pasaron, pero **hay que
   rectificar, y yo creo que los hombres se hacen grandes
   cuando rectifican y estoy rectificando**". (pág. 452, T.E.
   vista 24 de marzo 99)

24.    Aparte de la razón de conciencia que expresa Cartagena
Flores le movió a declarar ante los funcionarios federales en
1983 lo que expone era la verdad, en la vista de la Solicitud
de Reapertura no indicó concretamente, según señala ocurriera
entonces, qué otras cosas se quería que él dijese, quiénes
eran los que querían que lo hiciera y cuáles cosas le pasaron
que le movieran a no decir la verdad en aquella instancia.
Tampoco testificó concretamente en qué consistió la versión
que diera entonces a las autoridades locales y federales en
que se ubicaba fuera de la escena de los crímenes.

25.    De otro lado, a pesar de su afirmación de tratarse de
un asunto de conciencia como la razón que le llevó a rectificar
su testimonio anterior, cuando testificó ante el Lcdo. Corona
Muñoz, Cartagena Flores nuevamente condicionó declarar la
verdad a que se le concediera inmunidad. Su testimonio
siguiente describe este aspecto:

"LCDA. RODRIGUEZ BENITEZ:
   Le pregunto si el asunto de la prescripción de los
   delitos de perjurio fue algo que se discutió con el Lcdo.
   Michael Corona?

TESTIGO MIGUEL CARTAGENA FLORES:
   Con Michael Corona?

LCDA. RODRIGUEZ BENITEZ:
   Ajá.

TESTIGO MIGUEL CARTAGENA FLORES:
   Digo, yo no discutí eso con él.

LCDA RODRIGUEZ BENITEZ:
   No lo discutió. Mientras usted testificó en...

TESTIGO MIGUEL CARTAGENA FLORES:
   **Yo lo que le tiré fue una oferta de inmunidad. Si me la concedían, yo, diría todo lo que sé.**

LCDA. RODRIGUEZ BENITEZ:
   Y si no la concedían?

TESTIGO MIGUEL CARTAGENA FLORES:
   **Nadie se puede autoincriminar, usted lo sabe."** (pág. 458, T.E., vista 24 de marzo 99)

26.     En su testimonio Torres Marrero evidencia un manifiesto propósito de hacer aparecer a Cartagena Flores fuera de toda el área de los sucesos del Cerro Maravilla, ya sea en la escena misma de las muertes de los jóvenes donde ubican las Torres de Rikavisión o en cualquier otro lugar del área general del Cerro Maravilla. En forma muy sorpresiva este testigo abandonó este esfuerzo mediante la modificación de su versión cuando abruptamente reconoció la presencia de Cartagena Flores en el lugar donde se mantenía apresados a los jóvenes previo los hechos de sus muertes. La parte siguiente del testimonio de Torres Marrero describe esta apreciación:

"LCDA. VALDEJULI:
   Miguel Cartagena Flores no estaba allí?

TESTIGO RAFAEL TORRES MARRERO:
   **Ese no estaba por todos aquellos alrededores, ese tipo ni fue.** Ese independientemente está envuelto en... porque él a sabiendas y él sabe que ante Dios tiene que dar esa explicación de que en un futuro, él es el esposo de mi hermana y ella sabe que él no estaba por todo aquello. Porque él sí estuvo, yo no conozco y lo dicho y lo diré ante la Corte Celestial, él si estuvo, Cartagena Flores estuvo allí pero estuvo allí antes de las muertes. A raíz de las muertes él nunca estuvo allí presente." (pág. 499, T.E., vista 25 de marzo 99)

                    .....

TESTIGO RAFAEL TORRES MARRERO:
   Hubo un lapso, hubo un lapso en un momento de histeria alli donde los famosos testigos que usó Fiscalía en aquél

entonces también estaban en estado de histeria que atacaron a esta gente.

LCDA. RODRIGUEZ BENITEZ:
O sea que, los testigos **Miguel Cartagena Flores y Montañez estaban en la escena en los momentos de la histeria.**

TESTIGO RAFAEL TORRES MARRERO:
**Estuvieron en el momento de la escena, eso es así.** Estuvieron en el momento de la histeria y abandonaron la escena." (pág. 510-511, T.E., vista 25 de marzo 99)

.....

"HON. COMISIONADO:
**Y estando presentes estas personas allí, Méndez, Carmelo Cruz, Quiles, Cartagena, Montañés, se agredió a los jóvenes?**

TESTIGO RAFAEL TORRES MARRERO:
**Eso es correcto."** (pág. 530, T.E., vista 25 de marzo 99)

27. Según Torres Marrero, luego de la primera ráfaga de disparos se llevaron de la escena al agente encubierto González Malavé y después Luis Reverón dio muerte a Darío Rosado en lo que denominó la segunda ráfaga de disparos; añade que unos 6 a 7 minutos más tarde Rafael Moreno Morales dio muerte a Soto Arriví, en lo que llamó tercera ráfaga de disparos. (págs. 499-500; 513, T.E., vista 25 de marzo 99)

28. Conforme al testimonio de Cartagena Flores, tuvo lugar la siguiente secuencia de eventos: después de la primera ráfaga de disparos en el lugar de las Torres de Rikavisión y que él condujese al rehén del carro público J. Ortiz Molina hasta la Torre de la Policía custodiada por el Pol. Quiñones, expone que "viró" para regresar al lugar del incidente donde ocurrió la primera ráfaga, estacionó su vehículo paralelo a la Torre de la Telefónica, adyacente a la de Rikavisión, donde se encontraban Darío Rosado y Soto Arriví, desde donde observó que bajaban de ese lugar el agente Mateo, el Sargento Marrero, uno de sus supervisores, en unión a Pérez Casillas; que en ese momento él procedió a dejar su vehículo estacionado y se dirigió hacia ellos, cuando surgió otra serie de disparos

luego de lo cual Pérez Casillas le ordenó subir con él para que llevase a uno de los jóvenes al hospital; su respuesta fue mover su vehículo en reversa hasta el lugar de la Torre Rikavisión donde se montó en el mismo al cadáver de C. Soto que transportó en dicho vehículo hasta el Hospital de Jayuya, acompañado por Moreno Morales. Para el examen de estos eventos que describe Cartagena Flores, transcribimos esa parte de su testimonio:

TESTIGO MIGUEL CARTAGENA FLORES:
"Pues yo, tomé, el tipo ocupó el vehículo y yo lo llevé a la torre de la policía. Allí, pués, estaba un policía uniformado que responde al nombre de Quiñones. Yo le indico que, mira esta persona, que se quede bajo la protección de él, para que estuviera pendiente de él y lo dejo allí. Viro hacia el sitio procedente a donde surgió el incidente, estaciono el vehículo frente a una torre que le dicen la Telefónica que es paralela o adyacente a la torre de rikavisión, veo a Mateo, al Sargento Marrero, que ahora es Sargento, uno de los supervisores míos y a Pérez Casillas que bajan Yo me **voy hacia donde están ellos, o sea en unión a ellos y dejo el carro allí. Alli surge otra serie, en un momento dado, surgen otra serie de disparos** y en un momento dado Pérez Casillas me dice a mí, mira este, sube allá arriba que hay que...

LCDA. RODRIGUEZ BENITEZ:
Objeción a lo que le dijo Pérez Casillas.

HON. COMISIONADO:
Se permite.

TESTIGO MIGUEL CARTAGENA FLORES:
**Vamos a subir, entonces, llevate uno para el hospital. Entonces, pués, yo subo, cojo el vehículo, le doy riversa ahí montan a una persona y Moreno Morales me acompaña hacia el hospital de Jayuya.**

LCDO. SANTIAGO RIVERA:
**Quiénes son esas personas que usted trasladó al hospital de Jayuya?**

TESTIGO MIGUEL CARTAGENA FLORES:
**Carlos Soto Arriví.**" (págs. 438-39, T.E., vista del 24 de marzo 99)

29.    Según el testimonio de Torres Marrero en la vista, sólo seis agentes policíacos estaban presentes en el lugar de las Torres de Rikavisión del Cerro Maravilla en el momento de las muertes de los jóvenes. Indica que además de él, se encontraban Luis Reverón, Juan Bruno González, William Colón

Berríos, Rafael Moreno Morales y Nelson Colón González. Esta declaración de Torres Marrero en el siguiente testimonio:

"LCDA. VALDEJULI:
   Cuando llegaron los fiscales allí, usted le explicó a ellos lo que usted había visto como lo está explicando ahora?

TESTIGO RAFAEL TORRES MARRERO:
   No, nosotros inmediatamente después de los sucesos establecimos la defensa propia. Establecimos la defensa propia **y de las seis personas que habían allí,** porque nosotros lógicamente **dimos órdenes si salen de aquí tienen que ser nosotros seis porque aquí no había más nadie,** eran seis personas que estaban allí envueltas."
   (pág. 497, T.E., vista 25 de marzo 99)

Tomamos conocimiento del hecho indiscutible en el procedimiento de desaforo de que las muertes de los jóvenes no respondió a la defensa propia de los agentes policíacos, ilegalmente ideada para encubrir la verdad de lo acontecido en el Cerro Maravilla y que prevaleció hasta verificado su descubrimiento. Es evidente que del testimonio indicado del Torres Marrero aflora que su declaración de la presencia de sólo seis agentes en la escena de las muertes constituyó parte del esquema de la indicada fabricación de defensa propia. Consideramos que esta prueba del Peticionario de las seis únicas personas que se encontraban en la escena de las muertes no es otra cosa que la reversión de un componente de aquella teoría oficial de defensa propia traída ahora a través del testimonio de Torres Marrero. Es evidente que se pretende demostrar con la misma que al este testigo no mencionar a Cartagena Flores en el grupo de las seis personas allí presentes, significa que éste realmente no estaba en la escena de las muertes a diferencia de su propio testimonio en la vista de desaforo de que lo estaba. En las circunstancias aquí descritas la versión de Torres Marrero de que sólo seis personas estaban presentes en la escena de las muertes no es merecedora de crédito. Consideramos que ese componente del esquema de aquella fabricada teoría de defensa propia no puede

prevalecer en los hechos de lo ocurrido en el Cerro Maravilla. Por esta razón, tampoco merece crédito que Cartagena Flores no estuviera entre las personas presentes en el lugar de las Torres de Rikavisión del Cerro Maravilla cuando se dio muerte a los jóvenes.

28. [sic] El testimonio expresado de Torres Marrero de las seis únicas personas que estaban presentes cuando las muertes de los jóvenes es altamente confuso y contradictorio en sí mismo y por esta razón plantea otro serio obstáculo de credibilidad. Véase, que según su testimonio, además de él, estaban presentes en la escena de las muertes, Luis Reverón, Juan Bruno González, William Colón Berríos, Rafael Moreno Morales y Nelson Colón González. (pág. 522, T.E., vista 25 de marzo 99) No obstante, en otra parte de su testimonio Torres Marrero incluyó también en ese grupo a una persona de apellido Burgos cuyo primer nombre no expresó. (Véase, a la pág. 499, T.E., vista del 25 de marzo 99) No ofreció explicación para esta inconsistencia.

29. Además, al iniciar su relato de lo acontecido en el Cerro Maravilla, Torres Marrero expresó que Ríos Polanco fue el agente que se encontraba junto a él dentro de la caseta de Rikavisión en espera de la llegada del vehículo – en que venía el agente encubierto, los jóvenes y el rehén. (pág. 495, T.E., vista 25 de marzo 99) Durante el resto de su testimonio no se refirió sobre la situación de Ríos Polanco en el Cerro Maravilla. No obstante, en otra parte de su testimonio expresó que fue Nelson Colón González quien estaba junto a él dentro de la caseta de Rikavisión en espera de la llegada del vehículo que esperaban. (pág. 522, T.E., vista 25 de marzo 99) Tampoco ofreció explicación a esta otra inconsistencia. En esta clase de testimonio emergen varias interrogantes cuya respuesta no informa la prueba presentada. El alcance de la contradicción

e inconsistencia habida obliga al examen y análisis de la situación creada frente a varios supuestos: La identificación categórica que hace Torres Marrero de un grupo de seis personas por sus nombres como las únicas que estaban en el momento de las muertes a la vez que menciona en ese grupo, en clara contradicción, a una persona de apellido Burgos, no incluida en esa lista de seis, plantea la existencia de un número distinto en ese grupo de los presentes en la escena de las muertes. La otra contradicción de indicar que fue Nelson Colón González quien se encontraba dentro de la caseta de Rikavisión con él en espera por el vehículo cuando había dicho que era Ríos Polanco, también plantea un serio problema de credibilidad en el testimonio de este testigo. Al referirse posteriormente a Nelson Colón González como la persona que le acompañaba dentro de dicha caseta en espera del vehículo, levanta enorme duda de si este último pudo realmente estar entre el grupo de las seis personas que había indicado categóricamente como las únicas que estaban presentes en la escena de las muertes; muy particularmente si se examina que después de su descripción en que ubicó a Ríos Polanco con él dentro de la caseta no volvió a hacer referencia de la situación de éste en el Cerro Maravilla. Es decir, si cuando Torres Marrero declaró que era Ríos Polanco quien le acompañaba en la caseta de Rikavisión intentaba referirse a Nelson Colón González, es muy probable que se estuviera refiriendo a alguien cuyo paradero no volvió a conocerse en ese lugar y, por tanto, no integrara el exclusivo grupo de las seis personas que indicó estaba en la escena de las muertes. De otro lado, si cuando mencionó a Ríos Polanco como la persona que le acompañaba en dicha caseta no se estaba refiriendo a ninguna otra persona, la ubicación que hizo después de Nelson Colón González en ese lugar representa una contradicción

irreconciliable. Si es que se confundiera al ubicar inicialmente a Ríos Polanco con él en la caseta y la realidad es que fuera Nelson Colón González, según sucede con la mención del primero cuya situación o paradero posterior no fue informada, ello sugiere que Nelson Colón González no se encontraba en el grupo de las únicas seis personas presentes en la escena de las muertes. Por otro lado, estas consideraciones no excluye la posibilidad de que al identificar a Nelson Colón González entre el grupo de seis se estuviese refiriendo a Ríos Polanco lo que nos llevaría a la situación de que Nelson Colón González realmente no estaba en el grupo de seis.

De conformidad con la prueba presentada en la vista de desaforo la determinación hecha indica que dentro del espacio cerrado que comprendía dicha caseta se encontraban únicamente tres personas, a saber, el técnico de radiotransmisión y empleado de la empresa Rikavisión, Miguel Marte Ruiz y los dos agentes policíacos, José Ríos Polanco y Rafael Torres Marrero. (Véase, las determinaciones del Tribunal Supremo, a la página 19-20 de la Opinión.) Considerado este hecho y el singular y dramático momento que describe la presencia de estas personas allí, estimamos que Torres Marrero no podía confundir o equivocar la identificación de cada cual. Su errónea identificación de la persona que le acompañaba en ese instante no lo hace merecedor de credibilidad y no desvirtúa la determinación judicial previamente hecha. Bajo cualquiera de las variantes producidas por su confuso y contradictorio testimonio, no es posible otorgarle credibilidad sobre las personas que se encontraban en el momento de las muertes en el Cerro Maravilla ni para excluir la presencia de Cartagena Flores en esa ocasión y lugar.

**30.**    El testimonio de Torres Marrero en la vista de la Solicitud de Reapertura presenta inconsistencias adicionales que le restan credibilidad igualmente. Nos referimos en este instante a las que surgen de su testimonio en esa vista y de la declaración jurada prestada el 24 de enero 96 ante el Notario Público, Lcdo. Enrique Segarra Jr. (Affidavit 21597) en relación a la reinvestigación de los sucesos del Cerro Maravilla dispuesta por el Senado de Puerto Rico. Esa declaración jurada fue admitida en evidencia por acuerdo de las partes como el Exhibit 1 del Peticionario. Transcribimos a continuación los apartados números 5 y 6 de la misma, que son los que tienen pertinencia a la situación aquí presentada; además el testimonio mismo de Torres Marrero, a las págs. 530 a 536, T.E., de la vista del 25 de marzo 99:

**A. Apartados núms. 5 y 6, Declaración Jurada del 24 de enero 96:**

Apartado número 5: "Que con posterioridad al arresto, me personé a la escena al igual que otros varios agentes. Varios de **los agentes allí presentes golpearon a los arrestados.** Los agentes Antonio Méndez Rivera, José A. Montañez Ortiz, entre otros, agredieron alos**[sic]** arrestados."
Apartado número 6: "Que con posterioridad **a las golpizas,** varios de los agentes presentes abandonaron la escena."

**B. Testimonio de Torres Marrero, a las págs. 530–536, T.E., vista 25 de marzo 99:**
"COMISIONADO:
  Yo le pregunto que si estando esas personas presentes allí, **había ocurrido la agresión** a ellos o no había ocurrido todavía, yo le pregunto?

TESTIGO RAFAEL TORRES MARRERO:
  No. Estaba la agresión y **no era tal la agresión** porque lo único que era que cada uno de ellos, y lo digo así, que son los testigos, pasaron y le soltaron la mano. Entre ellos, todos ellos, Méndez, Cartagena Flores, todo el mundo le metió su empujón, porque la molestia que tenían que especificaba y se estaba...

COMISIONADO:
  Eso usted no lo describe como una agresión? Es que yo le pregunto agresión, y usted como que tuvo dudas sobre describirlo como agresión.
TESTIGO RAFAEL TORRES MARRERO:
  Porque es tal agresión.

COMISIONADO:

Le pregunto, usted cree que fuera agresión?

TESTIGO RAFAEL TORRES MARRERO:
**Puede ser agresión**, pero yo me estoy especificando y como yo esto y**[sic]** a una Distancia de aquí a donde está**[sic]** los dos caballeros allá más o menos, bregando que no
.....

COMISIONADO:
**Eso pudo ser golpiza?**

TESTIGO RAFAEL TORRES MARRERO:
**No la considero golpiza.**

COMISIONADO:
No?

TESTIGO RAFAEL TORRES MARRERO:
**No, tal como golpiza no.** Pero en el momento, yo estaba en ese momento yo estaba hablando con Malavé. Entonces después es que ellos salen de esa escena, de ahí, ellos se van.

COMISIONADO:
Me permite un segundo.

TESTIGO RAFAEL TORRES MARRERO:
Si.

COMISIONADO:
Aquí en esta declaración, yo le estoy leyendo de la declaración que usted presta el 24 de enero de 1996, a la que hizo referencia la Procuradora en las preguntas anteriores, y usted dice aquí, en el apartado número 5 que con posterioridad al evento me personé a la escena al igual que otros varios agentes.

TESTIGO RAFAEL TORRES MARRERO:
Ujum.

COMISIONADO:
Estoy leyendo literalmente. Varios de los agentes allí presentes golpearon a los arrestados.

TESTIGO RAFAEL TORRES MARRERO:
Ujum.

COMISIONADO:
Los agentes Antonio Méndez, José Rivera, José Montañez entre otros agredieron a los arrestados. **Con posteridad a las golpizas**, varios de los agentes presentes abandonaron la escena. **Usted en esta declaración, usted describe esa actuación de estos agentes como golpiza, y sin embargo aquí usted dice que no, que eso no es golpiza.**

TESTIGO RAFAEL TORRES MARRERO:
Cuando digo goliza **[sic]** es que...

COMISIONADO:
Perdóneme. Usted puede explicarme?

TESTIGO RAFAEL TORRES MARRERO:
Voy a explicarle.

COMISIONADO:

Ok.

TESTIGO TAFAEL TORRES MARRERO:
   **Yo por ejemplo considero golpiza, golpiza de una persona
   ahí botando sangre por boca y nariz, yo considero que
   es una golpiza.** Pero en específico en cuanto a empujones,
   un empujón o un cantazo con... yo no creo, yo no lo
   considero tal golpiza.

COMISIONADO:
   Ok, entonces por qué usted describió en esta
   declaración que usted prestó...

TESTIGO RAFAEL TORRES MARRERO:
   Pero, declaro ahí...

COMISIONADO:
   Déjeme que termine.

TESTIGO RAFAEL TORRES MARRERO:
   Ajá.

COMISIONADO:
   Por qué usted describió aquí a esta declaración como
   golpizas, por qué en esta declaración jurada?

TESTIGO RAFAEL TORRES MARRERO:
   Porque cuando se hace la pregunta en que si le habían
   dado, yo considero que lo habían tocado, y **que eso es
   una golpiza. Si todo el mundo le pasó la mano.**

COMISIONADO:
   Pero aquí usted, a preguntas de esta persona que le está
   haciendo la pregunta usted no dice que usted no cataloga
   como golpiza en la forma en que agredieron a los jóvenes
   allí, pero aquí la describió como golpiza.

TESTIGO RAFAEL TORRES MARRERO:
   Como golpiza cuando se hace la pregunta. Que qué fue
   lo que sucedió, bueno, como todo el mundo le pasó la
   mano allí.

COMISIONADO:
   No, no. Fíjese, yo le hice la pregunta específicamente
   que si se le dio una golpiza y usted me dice que golpiza
   no. Pero entonces veo que aquí usted había declarado
   que le había dado, que a su juicio fueron golpizas.

TESTIGO RAFAEL TORRES MARRERO:
   Y yo le digo que sí, que en la pregunta que se me hace
   ahí dije que sí que se le había dado, todo el mundo le
   dio. Pero lo que estamos hablando específicamente qué
   es considerar una golpiza.

COMISIONADO:
   Yo no quiero ahora que usted me describa...

TESTIGO RAFAEL TORRES MARRERO:
   Si no fuera golpiza...

COMISIONADO:
   Yo lo que quiero es que usted me diga por qué en esta
   declaración usted describe eso como golpiza y sin
   embargo cuando yo le pregunto, le hago la pregunta

directa, el término golpiza lo expuso esta persona que le hace las preguntas ahora y usted me, yo diría que me corrigió en el sentido de que usted no cree que eran golpizas. Pero sin embargo aquí, usted dijo que eran golpizas. Por que a mí me dice que no son golpizas y me corrige cuando yo le hago, le incluyo el vocablo golpiza en la pregunta, y aquí sin embargo usted mismo la describe como golpiza?

TESTIGO RAFAEL TORRES MARRERO:
   Porque en una pregunta dada, cuando se dice, porque específicamente golpiza...

COMISIONADO:
   Yo no quiero que usted...

TESTIGO RAFAEL TORRES MARRERO:
   Bien.

COMISIONADO:
   Me haga. Yo lo que quiero que usted me explique, me explique, por qué a mí, ahora, contestándome, me corrige de que yo, en mi pregunta que le incluí el vocablo golpiza, me corrige de que usted no diría que era golpiza, pero había, usted mismo, le había dicho golpiza en esta declaración jurada. Por qué dice en esta declaración dice golpiza y aquí, en este momento, no lo dice igual? Explíqueme.

TESTIGO RAFAEL TORRES MARRERO:
   **Porque golpiza para mi entender, golpiza es cuando hay más de una persona que ha dado.** Entonces, cuando se me hace la pregunta hubo una golpiza, sí, hubo una golpiza. Ahora, especificar meramente qué se considera una golpiza, entonces ya necesitaríamos aclarar.

COMISIONADO:
   O sea, que si a usted le hacen una pregunta que si hubo una golpiza, usted dice sí hubo una golpiza.

TESTIGO RAFAEL TORRES MARRERO:
   Sí una golpiza porque más de uno dio.

COMISIONADO:
   Eso fue lo que nosotros preguntamos.

TESTIGO RAFAEL TORREES MARRERO:
   Ah, bueno, perdone.

COMISIONADO:
   Porque éste que habla le preguntó, eso fue precisamente. Cómo fue que le preguntaron aquí la persona que le interrogó aquí al usted prestar esta declaración. Cómo fue que le preguntó? Le preguntó diferente?

TESTIGO RAFAEL TORRES MARRERO:
   No, yo dije que no.

31.    El testimonio transcrito de Torres Marrero que inmediatamente precede evidencia de éste el ejercicio de

gran esfuerzo y propósito de apartarse de su testimonio previo en que describió con el vocablo "golpizas" las consecuencias físicas de las agresiones de que fueron objeto los jóvenes previo a sus muertes. Sus claras evasivas e inconsistencias ponen en serias dudas su veracidad en particular sobre este punto como sobre su testimonio en general. No es hasta que es inquirido con forzado sentido incisivo, que se vio claramente obligado a admitir, como lo afirmara antes en la citada declaración jurada, que los agentes ocasionaron golpizas a los jóvenes, después de haberlo negado y mantenido que los golpes ocasionados fuese siquiera una agresión. Obsérvese, además, como después que expresara concebir la ocurrencia de "golpiza de una persona" cuando la agresión hace que se bote sangre por boca y nariz, intenta desvirtuar el efecto de su apreciación inicial hecha mediante su ingeniosa respuesta final de fundar su declaración de que se diera "golpizas" a los jóvenes, en que fueran agredidos por más de una persona. Tomamos conocimiento que la noción popular del vocablo "golpiza", no se diferencia de la que ofrecen diccionarios básicos: El Pequeño Larousse Ilustrado, (Ramón García Pelayo y Gross), edición 1964, informa que significa "paliza", "zurra" (pág. 508); "paliza" a su vez significa "tunda", "vapuleo" (pág. 758); "vapulear" es "azotar" (pág. 1050) que a su vez significa "golpear violentamente" (pág. 122), "con fuerza intensa, impetuosa" (pág. 1066) El Diccionario Manual Espassa-Calpe, edición 1945, define "paliza" como zurra de golpes dados con palos o en que se queda maltrecho (pág. 955); "tunda, como castigo riguroso de palos (pág. 1298) El Diccionario de la Lengua Española, 19na. edición, define "tunda" como infringir castigo a golpes, palos o azotes (págs. 1306-1307); "zurra" como castigo con azotes o golpes

(pág. 1370). El hecho que sean varios los que cometan la agresión no está apartado de las consecuencias de la agresión. En este caso la evidencia de fotografías en que fundamentó el Tribunal Supremo sus determinaciones de hechos sobre la existencia de hematomas en los rostros de los jóvenes son enteramente compatibles con la ocurrencia de golpizas con profusión de sangre por boca y nariz de acuerdo con la descripción de este tipo de agresión que según el propio testimonio de Torres Marrero ocurriera contra los jóvenes Darío Rosado y Soto Arriví. También, conforme a ese mismo testimonio la consecuencia de profusión de sangre por boca y nariz en las víctimas es igualmente compatible con el hecho que hayan sido varios los agresores. Este propósito demostrado por Torres Marrero de intencionalmente desconocer testimonio que antes hiciera, lo hace indigno de crédito.

32.    El Peticionario se refirió en su testimonio a varios documentos cuya admisión en evidencia fue denegada por el Comisionado Especial en la Resolución del 25 de agosto 98. No sustanció esa referencia con otra prueba que su propio testimonio en la silla testifical, expresado a manera de opinión expositiva. Relacionamos seguidamente a continuación esos documentos y estrictamente la referencia en los casos en que fue hecha:

.3 – (Declaración jurada de Carmen Aledo del 8 de septiembre 81 ante el Lcdo. H. Rivera Cruz.) El Peticionario fundamentó la relevancia de esta declaración en que hubiese refrescado la memoria de esta testigo en la vista de desaforo.

.5 – (págs. 27 y 28 de la deposición prestada el 23 de enero 81 por el agente del NIE, William Rodríguez Suárez en el caso Soto v. Romero, Civil 79-236 del Tribunal de Distrito Federal de San Juan) El Peticionario informa que con esta prueba se

propone demostrar que Rodríguez Suárez recibía prueba y la sometía a análisis sin consultarle. Expresa que se enteró de esta prueba en el año 1994; al ser inquirido específicamente sobre la manera en que la obtuvo, indicó al efecto de no poder precisarlo. De otro lado, expresó ignorar cuándo la Oficina del FEI obtuvo esta prueba.

.7 – (pág. 76 de declaración prestada por el Pol. J. Quiñones el 15 de agosto 78) El Peticionario se limitó a expresar que presenta esta prueba por el hecho que J. Quiñones era un testigo de cargo en su contra.

.8 – (págs. 39 y 40 de declaración jurada prestada por W. Rodríguez Suárez el 7 de diciembre 81 ante el Lcdo. H. Rivera Cruz). Se presenta con el fin de impugnar el propio testimonio de Rodríguez Suárez en cuando al manejo de la evidencia.

.15 – (págs. 1, 27, 28 y 29 de declaración prestada por J. Quiñones y su esposa Betzaida Velázquez el 28 de junio 91 ante la Lcda. Marta Vera)

.22 – (Declaración jurada del Capitán de Policía Mariano Morales Torres ante Lcdo. H. Rivera Cruz del 27 de noviembre 81) No se indicó sobre la pertinencia de esta prueba.

.30 – (declaración de Hiram Santiago Figueroa del 10 de diciembre 81 ante el Lcdo. H. Rivera Cruz) El declarante es la persona que embalsamó el cadáver de C. Soto Arriví. Se presenta esta prueba sobre el extremo del examen de los golpes que muestra.

.36 – (declaración jurada del Lcdo. José Romo Matienzo del 24 de febrero 83 ante el Lcdo. H. Rivera Cruz) Se indica que se somete esta prueba en relación al manejo de la evidencia.

.39 – (declaración jurada de Teresa García Torres prestada el 16 de julio 86 ante la Lcda. Maricarmen Ramos de Szendrey)

.40 – (declaración jurada de W. Rodríguez Suárez prestada el 26 de septiembre 85 ante la Lcda. Maricarmen Ramos de Szendrey)

.48 – (declaración jurada prestada por J. Quiñones el 15 de abril 86 ante el FEI)

.51 – (declaración jurada prestada por Nery Cabret el 20 de junio 86 ante la Lcda. Maricarmen Ramos de Szendrey) El Peticionario indica que esta persona participó como taquígrafa en la redacción del Informe Colton-Figueroa del 29 de agosto 78 y el propósito es que declare sobre su participación en esa redacción.

.54 – (declaración jurada de Enrique Pérez Ginorio ante el Lcdo. H. Rivera Cruz del 25 de mayo 84) El Peticionario aduce que esta persona participó en la preparación del Informe Colton-Figueroa del 29 de agosto 78 y su propósito es que se reciba ésta su declaración sobre las circunstancias en que se presentó dicho informe.

.67 – (deposición de J. Quiñones del 20 de junio 80 en el caso Civil 79-236, Soto v. Romero del Tribunal de Distrito Federal)

.74 – (Informe NIE-033-78-IG, Caso Bilbraut)"

El Comisionado Especial formuló unas conclusiones generales de derecho[12] sobre el tema de la admisibilidad de prueba exculpatoria, lo que constituye o no prueba exculpatoria y limitaciones a la norma de la obligación del Fiscal de entregar tal prueba a la defensa. Posteriormente formuló conclusiones de derecho sobre la aplicación de tales normas a las determinaciones de hechos.[13] A continuación, una relación de dichas conclusiones:

"**I. Conclusiones Sobre las Determinaciones de Hechos núms. 1 a 5:**

Examinamos las determinaciones que surgen de los número 1 a 5 de este informe a tenor con las decisiones de los casos de Brady v. Maryland, 373 U.S. 83 (1963) y United States v. Bagley, 473 U.S. 667 (1985), de la jurisdicción norteamericana y Pueblo v. Colón Rivera, 93 D.P.R. 852, 855 (1977), Pueblo v. Rodríguez

---

[12] Véase Informe, págs. 32 a la 37

Sánchez, 109 D.P.R. 243 (1979), y Pueblo v. Rivera Rodríguez, 138 D.P.R. 138 (1995), de Puerto Rico. Conforme a las mismas, la obligación que podamos atribuir al FEI por no haber suministrado al Peticionario prueba obrante en la Oficina de Archivo del Senado dependerá del carácter exculpatorio o favorable que reuna. La alegación de colusión entre la Ofician del FEI y el Senado para que esta última tuviese a su disposición y examinara la prueba en dicho archivo con exclusión del Peticionario no tiene base en la prueba presentada; tampoco la de ocultación sistemática de prueba por parte del FEI.

---

[13] Véase Informe, págs. 37 a la 47

En la determinación del carácter exculpatoria o favorable de la prueba seguiremos la norma jurisprudencial de los casos citados de que lo será cuando exista una razonable probabilidad que de haber sido revelada el resultado del proceso habría sido diferente. Pueblo v. Rivera Rodríguez, supra, United States v. Bagley, 473 U.S. 667 (1985); o que haberla suprimido ocasionara un juicio digno de confianza. Kyles v. Whitley, 514 U.S. 419 (1995). Ausente este carácter exculpatorio o favorable de la prueba, determinaremos el derecho y la obligación del Peticionario a recibirla y el FEI a suministrarla dependiendo que se trate de nueva prueba descubierta y que se cumpla los requisitos legales siguientes: **(a)** que no se pudo descubrir con razonable diligencia antes del juicio, **(b)** no es meramente acumulativa, **(c)** no impugna la prueba aducida durante el juicio, **(d)** es creíble y **(d)** probablemente producirá un resultado diferente. Pueblo v. Morales Rivera, 115 D.P.R. 88 (1984); Pueblo v. Morales 66 D.P.R. 10 (1946).

**II. (Sobre las Determinaciones de Hechos Núms. 6 a 10):**

**1.** Las determinaciones de hechos 6 a 10 expone el resultado del testimonio de Andrades el cual cubre dos aspectos. En el primero Andrades testifica al efecto que durante 5 a 6 minutos de su presencia la mañana del 17 de agosto 78 en la Oficina de Colton Fontán mientras se interrogaba al Pol. Quiñones, no vio al Peticionario en la misma. El Peticionario presenta esta prueba con el propósito de impugnar testimonio presentado en la vista de desaforo que sirvió de base a la determinación judicial de la participación del Peticionario en ese interrogatorio al Pol. Quiñones; asimismo, contra el Cargo número 2 que formulara el Procurador General en forma conjunta a Colton Fontán y al Peticionario. Según la prueba originalmente presentada este interrogatorio demoró varias horas. En el supuesto que concediéramos entera credibilidad a este testimonio de Andrades,

su expresada presencia en ese lugar apenas 5 a 6 minutos en relación a un evento de varias horas de duración, es prueba sumamente insuficiente y débil para persuadir que el Peticionario no participara en ese interrogatorio según lo informa el resultado del procedimiento de desaforo. (Véase, a las págs. 55 a 58 de la Opinión del Tribunal Supremo.)

**2.** El segundo aspecto tiene que ver con el testimonio de Andrades de haber sido entrevistado posteriormente por más de una ocasión por los representantes legales del FEI en el Estado de la Florida, a quienes informó la versión de su presencia indicada en la Oficina de Coltón **[sic]** Fontán en la mañana del 17 de agosto 78. El propósito que surge en la presentación de esta prueba consiste en intentar demostrar su naturaleza exculpatoria o favorable, que el FEI la conocía de antemano y la ocultó al Peticionario. Sin embargo, de acuerdo al testimonio de Andrades y la información de los autos, la primera de las entrevistas que realizara con los representantes del FEI ocurrió a mediados de 1987 mientras la vista de desaforo concluyó el 26 de marzo 87 cuando el caso quedó sometido por las partes. (Véase, a la pág. 7, nota 4 de la Opinión del Tribunal Supremo.) Es decir, si los representantes del FEI vinieron en conocimiento de esa parte de la versión de Andrades, ello ocurrió con posterioridad a la ventilación del procedimiento de desaforo lo cual descarta la alegación de ocultación de esa prueba y bastaría para denegarla. De todos modos, no asistiría la razón al Peticionario si se atiende al hecho que ese testimonio no alteraría de manera alguna la determinación hecha de la participación del Peticionario en el interrogatorio al Pol. Quiñones el 17 de agosto 78. Esto significa que no representa prueba exculpatoria o favorable y, por tanto, no existía obligación de suministrar esa prueba al Peticionario. Vista la norma de Brady expresada y las decisiones de United States v. Bagley, supra, Kyles v. Whitley, supra, y Pueblo v. Rivera

Rodríguez, supra, esa prueba carece de materialidad y no puede considerarse suprimida por no existir la razonable probabilidad que de haberla tenido el Peticionario en la vista de desaforo, el resultado del proceso habría sido diferente; tampoco surge que por la falta de contarse con la misma se haya ocasionado un juicio que no sea digno de confianza. Por otra parte, visto ese testimonio en carácter de nueva prueba descubierta su consideración como fundamento a la reapertura es también improcedente. La misma comprende prueba impugnatoria de la prueba aducida durante el juicio, no producirá probablemente un resultado diferente y no fue demostrado que no pudo ser descubierta con razonable diligencia antes del juicio. Pueblo v. Morales Rivera; supra; Pueblo v. Morales, supra y demás casos citados sobre este tema a la pág. 2 de la Resolución del Comisionado Especial del 25 de agosto 98.

## II. (Sobre las Determinaciones de Hechos núms. 11, 12 y 13):

3. Las determinaciones de hechos números 11, 12 y 13 recogen el resultado del testimonio de Teresa García de haber sido la taquígrafa que tomó la declaración jurada del Pol. Quiñones en el hogar de éste la mañana del sábado 26 de agosto 78. Teresa García testificó al efecto que delante de ella esa declaración se llevó a cabo en ambiente de tranquilidad sin que hubiese discusión entre el Pol. Quiñones y el Peticionario. Además, que prestó declaración ante el Investigador del Senado y los representantes del FEI a ese mismo efecto. Con esta prueba se intenta impugnar el testimonio del Pol. Quiñones en la vista de desaforo y atacar el Cargo número 3 que formulara el Procurador General en forma conjunta al Peticionario y a Colton Fontán y las correspondientes determinaciones de hechos y conclusiones del Tribunal Supremo. (Véase, las determinaciones a las páginas 58 a 60 y las conclusiones a la página 142 de la Opinión del Tribunal Supremo. Se advierte del error mecanográfico que aparece a la página 142

de la Opinión al referirse al 26 de julio 78 cuando debe ser 26 de agosto 78) a tenor con la determinación de hecho que se origina en su página 58.) Se presenta también en apoyo de la alegación de que el FEI conocía de antemano de esa prueba sin divulgarla al Peticionario.

**4.** En vista de lo expuesto concluimos que el testimonio de Teresa García no habría significado ningún tipo de alteración o modificación al resultado del caso, por lo cual no tiene carácter de prueba exculpatoria a favorable al Peticionario. Se advierte que en la medida que ella se mantuvo dentro del vehículo estacionado afuera en la calle unos 25 minutos, no pudo ser testigo de lo que ocurriese en el área de la residencia del Pol. Quiñones y, por tanto, de la conducta conjunta del Peticionario y el querellado Colton Fontán. Por ello, esa prueba no hubiese servido para excluir la conducta del Peticionario. Más aún, la determinación del Tribunal Supremo consigna que el intercambio oral o argumentación habida con el Pol. Quiñones tuvo lugar mientras Teresa García se mantuvo en el vehículo afuera en espera que concluyese dicha argumentación y se decidiese si se podía entrar a la casa. (Véase, a la página 60 de la Opinión del Tribunal Supremo.) En este sentido el presente testimonio de Teresa García es enteramente compatible con la prueba presentada en la vista de desaforo sobre lo sucedido en esa ocasión el 26 de agosto 78. Es prueba acumulativa que más bien completa la presentada en la vista de desaforo al expresar el tiempo que ella permaneció afuera dentro del vehículo. Su testimonio de que **"delante de ella"** no ocurriera discusión entre el Pol. Quiñones y el Peticionario es enteramente conciliable con la prueba testifical recibida en la vista de desaforo y la determinación hecha sobre la misma que contempla que ella estuvo afuera dentro del vehículo hasta que concluyó la argumentación luego de lo cual fue que entró a la casa para la toma de la declaración. En vista de ello, concluimos que

el testimonio expresado de Teresa García no constituye prueba exculpatoria o favorable ya que de haberla tenido el Peticionario no habría probablemente producido un resultado diferente del procedimiento de desaforo contra él; Tampoco la ausencia de ese testimonio ha significado un juicio carente de confianza. En estas condiciones no vemos que el FEI viniese obligado a suministrar la información de ese testimonio al Peticionario. Pueblo v. Rivera Rodríguez, supra; United States v. Bagley, supra; Kyles v. Whitley, supra.

5. Descartada la obligación del FEI para divulgar al Peticionario el testimonio expresado de Teresa García, el mismo tampoco cualifica como prueba nueva descubierta para sostener la Solicitud de Reapertura. El carácter creíble de ese testimonio constituye el único requisito que se cumple para que sirva de fundamento a la solicitud de reapertura fundada en el descubrimiento de nueva prueba. Las razones ya expuestas explican el incumplimiento de los requisitos que exigen que la prueba no sea acumulativa, no impugne la prueba aducida durante el juicio y que probablemente produzca un resultado diferente del juicio. Solo queda por exponer la razón por la cual no se dio la condición de demostrarse que se trata de prueba que no se pudo descubrir con razonable diligencia antes del juicio. Pueblo v. Morales Rivera; supra; Pueblo v. Morales, supra y demás casos citados sobre este tema a la pág. 2 de la Resolución del Comisionado Especial del 25 de agosto 98. Para juzgar el cumplimiento de este requisito debemos tomar en cuenta la presencia de circunstancias que hacen forzoso concluir que el Peticionario debió conocer el testimonio que daría Teresa García y pudo presentarlo en la vista de desaforo. La prueba sugiere que se trata de una persona con quien el Peticionario ha debido mantener una excelente relación susceptible lograr con ella fácil comunicación, como en efecto debió ser cuando la anunció formalmente como su testigo. Cuando

optó por no llamarla a testificar claramente desaprovecho la oportunidad de llevar a la atención del juzgador aquellos hechos que estimara favorable a su caso. Otro punto relevante señala que siendo ella su testigo, el conocimiento que debió tener acerca de lo que declararía, incluye su versión de la conducta de uno de los fiscales que le interrogaba la cual interpretó como amenaza. Este último extremo representaba por sí sólo razón principal para haberla colocado en la silla testifical en la vista de desaforo. Ello hubiese significado confrontar a dicho fiscal y permitirle la oportunidad de responder y al Comisionado Especial evaluar esa situación y proveer la medida adjudicativa o remedial a su alcance. Aparte de la manera lacónica en que se trae este asunto, el Peticionario ha esperado un período irrazonablemente largo para hacerlo. Desde que concluyó la vista de desaforo el 20 de marzo 87 hasta el 20 de marzo 96 en que radicó la Solicitud de Reapertura trascurrió 9 años. Añadase el hecho del fallecimiento del Fiscal aludido con antelación a la fecha de la vista de la Solicitud de Reapertura. En estas condiciones la atención del mismo es completamente inmeritoria.

**III. (Sobre la Determinación de Hecho Núm. 14):**

**6.** Con la prueba relacionada en la Determinación de Hecho número 14 se intenta que juzguemos la interpretación legal del Lcdo. Corona Muñoz sobre el significado en los méritos de la Solicitud de Reapertura de las declaraciones juradas de Carmen Aledo y Teresa García ante el Lcdo. H. Rivera Cruz del 8 de septiembre 81. En innecesario abundar la improcedencia en derecho de someter esta prueba con tal propósito. El hecho que el Lcdo. Corona Muñoz descansara su apreciación legal sobre la base de testimonios por él desconocidos de Carmen Aledo y Teresa García haría este asunto académico de todos modos. Nada más que proveer al respecto.

**7.** No procede la reconsideración a la admisión en evidencia de los documentos siguientes sometidos en relación a los hechos cubiertos en la Determinación de Hecho número 5:

> 8. – (pág. 76 de declaración jurada del Pol. J. Quiñones el 15 de agosto 78 ante el Lcdo. Alvarado Santos)

> 15. –(págs. 1, 27, 28 y 29 de declaración prestada por el Pol. Quiñones y su esposa Betzaida Velázquez el 28 de junio 91 ante la Lcda. Marta Vera)

> 48. –(declaración jurada del Pol. J. Quiñones del 15 de abril 86 ante el FEI

> 67. –(deposición del Pol. J. Quiñones del 20 de junio 80 en el caso Civil 79–236, Soto v. Romero ante el Tribunal de Distrito Federal de San Juan)

Ninguna de esta prueba constituye prueba exculpatoria o favorable que obligara al FEI a suministrarla al Peticionario, en vista que de haberse tenido durante la vista de desaforo no habría significado un resultado distinto del proceso ni le resta confianza. Pueblo v. Rivera Rodríguez, supra; United States v. Bagley, supra; Kyles v. Whitley, supra De otro lado, el Peticionario no ha demostrado haber cumplido respecto de estos documentos las condiciones esenciales que sirvan de fundamento para nuevo juicio como nueva prueba descubierta. Pueblo v. Morales Rivera; supra; Pueblo v. Morales, supra. Ninguno de esos documentos probablemente produciría un resultado diferente del procedimiento de desaforo llevado a cabo contra el Peticionario ni se ha demostrado que no pudo ser descubierto con razonable diligencia antes de la vista de desaforo, muy particularmente la deposición del Pol. J. Quiñones del 20 de junio 80 en el caso, Soto v. Romero, Civil 79–236 de la Sala del Tribunal de Distrito Federal de San Juan.

**IV. (Sobre la Determinación de Hecho número 15):**

**8.** La Determinación de Hecho número 15 expone la situación de las declaraciones juradas de Carmen Aledo y Teresa García

prestadas ante el Lcdo. Rivera Cruz el 8 de septiembre 81 las cuales el Peticionario alega que les fue ocultada. En la disposición de la Determinación de Hechos números 12 y 13 hemos expuesto las razones por las cuales la declaración expresada de Teresa García no constituye prueba exculpatoria o favorable que tuviese que ser entregada por el FEI ni prueba nueva descubierta que justifique la concesión de la Solicitud de Reapertura. La declaración indicada de Carmen Aledo tampoco reúne carácter de prueba exculpatoria o favorable por no representar cambio probable en el resultado del proceso de desaforo de haberla tenido el Peticionario ni que afecta el carácter confiable que reviste la Sentencia de desaforo. Pueblo v. Rivera Rodríguez, supra; United States v. Bagley, supra; Kyles v. Whitley, supra. El carácter de nueva prueba que no pudo ser descubierta mediante diligencia razonable queda excluido si se considera que aún en el marco del testimonio ambivalente del Peticionario que expone la Determinación de Hecho número 15, éste conocía que Carmen Aledo había prestado dicha declaración desde el 2 de febrero 87 y no en 1994, como pretendió demostrar. En estas circunstancias pudo gestionar la presentación del testimonio de esa testigo en la vista de desaforo sin que se demuestre que hubiera obstáculo para que no pudiera hacerlo. Esta sola circunstancia basta para que se entienda incumplido el requisito del ejercicio de razonable diligencia antes del juicio que contemplan como fundamento para reapertura los casos de Pueblo v. Morales Rivera; supra; Pueblo v. Morales, supra.

**V.    (Sobre las Determinaciones de Hechos números 16, 17 y 18):**

**9.**    Las determinaciones de hechos números 16, 17 y 18 se refieren a las objeciones del Peticionario a las determinaciones que hiciera el Tribunal Supremo de los hallazgos de marcas de golpes y hematomas en los rostros de los jóvenes muertos. Reclama mediante su propio testimonio y el del Lcdo. Corona Muñoz las

declaraciones juradas relacionadas de los Patólogos en calidad de prueba exculpatoria o favorable que alega le fue ocultadas. Sin embargo, se desprende de ambos testimonios que la información de las declaraciones juradas de los Patólogos, Drs. J. Ramos, R. Críado y R. Rigal aludidas es igual a la que sirvió de base al Informe Colton-Fontán-Figueroa Vivas del 29 de agosto 78. (Dicho informe constituyó los Exhibits de la vista de desaforo números 25 del FEI, 20 de Colton Fontán y 13 del Peticionario.) Por tanto, es igual a la que tuvo el Tribunal Supremo ante sí al emitir la Sentencia de desaforo. Desde esta óptica la consideración en este momento de esas declaraciones juradas representaría la relitigación del extremo que tiene que ver con los hallazgos de marcas de golpes y hematomas en los rostros de los jóvenes. Tratándose del examen de prueba igual a la que antes se tuvo, es muy improbable que se produzca un resultado distinto. Además, no vemos cómo la ausencia de esa prueba haya significado el resultado de un proceso digno de confiar. Por ello, a tenor con la jurisprudencia citada las declaraciones juradas indicadas de los Patólogos no constituyen prueba exculpatoria o favorable que el FEI viniera obligado a suplirle al Peticionario. Pueblo v. Rivera Rodríguez, supra; United States v. Bagley, supra; Kyles v. Whitley, supra. De otro lado, según se expone en las determinaciones de hechos, la información del resultado de las observaciones de los cuerpos de los jóvenes muertos por dichos patólogos fue conocida por el Peticionario directamente de esos facultativos durante la etapa investigativa de los sucesos del Cerro Maravilla que él efectuara; asimismo, fue prueba utilizada como parte del informe de esa investigación que confeccionara y emitiera en unión a Colton Fontán. Siendo esa información del Informe Colton Fontán-Figueroa Vivas igual a la que contiene las declaraciones juradas de esos mismos patólogos, éstas tampoco pueden ser catalogadas como prueba nueva descubierta que sirva

para sostener la Solicitud de Reapertura. Aún si considerásemos que técnicamente lo fueran, no se cumple con requisitos indicados para la concesión de ese remedio. No se trata de prueba que probablemente produzca un resultado diferente del proceso de desaforo llevado a cabo, es prueba más bien acumulativa y el Peticionario no ha demostrado que no pudo obtenerla con razonable diligencia antes de la vista de desaforo. Sobre este último requisito, habiendo el Peticionario conocido el resultado de esas observaciones hechas por dichos patólogos en el momento y para la confección del referido informe de su investigación, no demostró la existencia de obstáculo que le impidiese presentarlos en calidad de testigos en dicha vista y optó por no llamarlos a testificar. Véase, aquellos casos en que el tribunal ha afirmado la obligación que tiene una parte de descubrir prueba por haber tenido el conocimiento de hechos esenciales que le permiten utilizar testimonios que considera exculpatorios o favorables. Unites States v. Prior, supra; United States v. Morales, supra; Reiteramos que desde este otro ángulo tampoco es procedente la Solicitud de Reapertura para traer esa prueba. Pueblo v. Morales Rivera; supra; Pueblo v. Morales, supra.

**VI.  (Sobre las Determinaciones de Hechos números 19 a 31).**

**10.** Evaluamos y analizamos los hechos que surgen de los testimonios de Cartagena Flores y Torres Marrero en las determinaciones de hechos números 19 a 31. Entre los objetivos que se evidencia demostrar con esta prueba está que al inicio del trámite de la gestión de inmunidad para poder declarar su nueva versión Cartagena Flores informara al Lcdo. Rivera Cruz que no se encontraba en la escena del crimen al momento de las muertes de los jóvenes. Asociado a este propósito está también la alegación del Peticionario de atribuir al FEI el conocimiento de esa información adelantada al Lcdo. Rivera Cruz y que la misma le fue ocultada. Examinado el testimonio de Cartagena Flores en

su totalidad, no nos merece crédito esta versión. Además, no se ha demostrado el conocimiento del FEI de esa información aludida. No existe prueba documental o material indicativa que tal información obrara en la Oficina de Archivo del Senado ni existe base de cualquier otra manera que autorice a imputarle el conocimiento de esa información al FEI, si es que realmente ocurriera.

11. Al evaluar dicho testimonio de Cartagena Flores no podemos pasar por alto que se produjo en el marco de su decisión de decir toda la verdad sobre lo acontecido en la escena de las muertes del Cerro Maravilla y abandonar su posición por la cual no estaba diciendo toda la verdad. Hasta ese momento la versión prevaleciente era la de los miembros de la Policía de haberse dado muerte a los jóvenes en un intercambio de disparos. Por ello, esa gestión de inmunidad por Cartagena Flores sobre la base de que diría la verdad de lo ocurrido en el Cerro Maravilla significaba necesariamente que descubriría la verdad hasta entonces ocultada o encubierta de lo sucedido en la escena de las muertes. Esto obviamente supuso que expresaría su conocimiento personal de lo sucedido en ese lugar. No le concedemos crédito de que iniciara esa gestión de inmunidad informando al Lcdo. Rivera Cruz que ignoraba lo sucedido por no encontrarse en la escena de las muertes. Esta expresión no habría tenido la consecuencia que dicho funcionario lo refiriera rápidamente ante el Fiscal Federal para que iniciase el trámite de su petición de inmunidad como en efecto se demostró que hizo y la misma noche de ese día comenzó el trámite para la obtención de la inmunidad federal. Carece de todo sentido que el Lcdo. Rivera Cruz lo refiriera ante el Fiscal Federal para que tramitara dicha inmunidad si su nueva versión era que ignoraba todo sucedido por no encontrarse en la escena de las muertes. El hecho que ese trámite de inmunidad en efecto se iniciara es indicativo que su nueva versión le ubicaba en el momento de las

muertes ya que lo contrario no representaba paso adelante en la investigación en circunstancias en que Cartagena Flores fue la primera persona que se acogió a la inmunidad del Senado.

12. En otro aspecto, el testimonio de Torres Marrero de la secuencia de las muertes que expresa que Luis Reverón ocasionó la muerte de Darío Rosado en la segunda ráfaga de disparos y que en una tercera ráfaga ocurrida 6 o 7 minutos después Moreno Morales dio muerte a Soto Arriví, es irreconciliable con el testimonio de Cartagena Flores de haber llegado al lugar de la Torre de Rikavisión en el instante mismo de producirse dicha segunda ráfaga seguida de lo cual se montó allí en su vehículo al cuerpo de Soto Arriví procediendo él a transportarlo hasta el Hospital de Jayuya en unión a Moreno Morales. Es decir, que Cartagena Flores informa al efecto de haber retirado el cuerpo de Soto Arriví en momento en que según la versión de Torres Marrero no se habían producido aún los disparos contra Soto Arriví que le ocasionó la muerte. Una manera racional de armonizar ambas versiones supone que consideremos que cuando se montara al cuerpo de Soto Arriví en el vehículo de Cartagena Flores, ya éste se encontraba en la escena de las muertes lo cual es compatible con su ubicación en la misma como testigo presencial que surge de su testimonio en la vista de desaforo.

13. Concluimos que ninguno de los testimonios mencionados de Cartagena Flores y Torres Marrero constituye prueba exculpatoria o favorable al Peticionario. En vista de las circunstancias expuestas que describen los mismos, concluimos, además, que no existe probabilidad que conduzcan a cambio o modificación alguna en el resultado del procedimiento de desaforo. Estimamos que de realizarse algún cambio en el proceso de desaforo sobre la base de lo que se pretende por esos testimonios, ello restaría a la certeza y confianza del mismo; asimismo, pondría en peligro la necesidad de que responda a la verdad a los eventos ocurridos.

**VII. (Sobre la Determinación de Hecho número 32):**

**14.** Finalmente, hemos reexaminado la prueba que comprende los documentos aludidos por el Peticionario bajo la determinación de hecho número 32 conjuntamente con los restantes del Apartado II del Informe Conjunto de Conferencia y no encontramos que amerite modificarse en cuanto a los mismos el dictamen del Comisionado Especial del 25 de agosto 98. De esos documentos, algunos se originaron con posterioridad a la fecha en que concluyó la vista de desaforo y, por tanto, su admisión como prueba nueva descubierta es inoperante. Son los siguientes documentos: **15** (declaración de los esposos Jesús Quiñones y Betzaida Velázquez del 28 de junio 91 ante la Lcda. Marta vera **[sic]**), **16** (declaración de Enrique A. Meliá León del 12 de mayo 87 ante el Lcdo. E. Pérez Viera), **33** (declaración jurada del Dr. R. Críado del 18de septiembre 90), **49** (comunicación de la Lda. Nilka Marrero al Secretario de Justicia del 26 de enero 96), y las declaraciones juradas bajo el número **78 (a)** Angel Figueroa Vivas del 7 de septiembre 95, **(b)** Teresa García del 29 de enero 96, **(c)** Luis Reverón Martínez del 16 de diciembre 95, **(d)** Juan Bruno González del 28 de agosto 95, **(e)** Rafael Torres Marrero del 5 de septiembre 95, **(f)** William Colón Berríos del 5 de septiembre 97, **(g)** Rafael Moreno Morales del 28 de agosto 95 y **(h)** Nelson Gonzalez del 28 de junio 96. Los restantes documentos de dicho apartado II.A del Informe Conjunto no comprende prueba exculpatoria o favorable al peticionario según estas nociones son contempladas por la jurisprudencia citada de <u>Pueblo</u> v. <u>Rivera Rodríguez</u>, supra; <u>United States</u> v. <u>Bagley</u>, supra; <u>Kyles</u> v. <u>Whitley</u>, supra. Tampoco constituyen prueba nueva descubierta con relación a la cual el Peticionario haya cumplido los requisitos para que sean admitidas de <u>Pueblo</u> v. <u>Morales Rivera</u>; supra; <u>Pueblo</u> v. <u>Morales</u>, supra; muy especialmente, por ser improbable que de haberlos tenido el Peticionario se habría producido un resultado distinto del

proceso de desaforo y por no haberse demostrado que son documentos que no pudo descubrir con razonable diligencia antes de la vista de desaforo. No hubo ofrecimiento en evidencia de los documentos relacionados bajo el apartado I. A y B del Informe Conjunto. (Excluidos los que aparecen duplicados bajo el apartado II de otro modo inadmisibles. Por tanto, no existe nada más que proveer en cuanto a los mismos.

Además de los casos normativos citados de Brady, Bagley, Kyles y Moore citados, los restantes citados informan decisiones que plantean situaciones que son de análoga aplicación a las que enmarcan las distintas determinaciones de hechos de este caso. Por ello, entiéndase aplicables en forma general y específica a las mismas las decisiones de los restantes casos citados."

Sometido ante este Tribunal el Informe del Comisionado Especial el Peticionario presentó una extensa Réplica el 13 de agosto de 2001, la cual hemos examinado detenidamente.

IV

A los fines de evaluar la solicitud de reapertura del Peticionario dentro de la perspectiva adecuada conviene examinar cuales fueron los hechos que este Tribunal encontró probados en *In re Colton Fontán*, supra, que dieron lugar a su separación del ejercicio de la abogacía.[14]

En dicho caso, cuya reapertura ahora se solicita, expresamos:

> "*No albergamos dudas de que los querellados Colton Fontán y Figueroa Vivas incurrieron, individual y concertadamente, en conducta tendente a orientar la investigación hacia la teoría de defensa propia de la Policía.* En esa tarea tuvieron éxito por tiempo limitado. Para alcanzarla intervinieron impropiamente con varios testigos y lograron que estos cambiaran sus testimonios. Sus conductas atentaron contra principios deontológicos básicos. No sólo merecen nuestro repudio y censura, sino también la imposición de las más severas sanciones disciplinarias." *In re Colton Fontán,* supra, pág. 107.

Mas adelante concluimos:

> "En cuanto a *Figueroa Vivas,* es obvio que el 17 de agosto de 1978 *coaccionó* al policía Quiñones Quiñones y ejerció presión indebida sobre él para que alterara su declaración sobre las dos ráfagas de disparos, hecho que era incompatible

---

[14] Recientemente este Tribunal readmitió a la práctica de la abogacía al Lcdo. Colton Fontán. Véase *In re Colton Fontán,* resuelto el 18 de junio de 2001, 2001 JTS 92. A diferencia del caso de autos, en que se solicita la reapertura de los procedimientos, el Lcdo. Colton Fontán solicitó la reinstalación estando seriamente arrepentido de la conducta antiética en que incurrió y por la cual fue disciplinado.

con la versión de defensa propia de la Policía. Sin explicación, destruyó además parte de la declaración jurada inicial que ese testigo le ofreció en esa fecha.

Además, *Colton Fontán y Figueroa Vivas,* en su desempeño como fiscales independientes y actuando combinadamente, el 17 de agosto de 1978 le ofrecieron empleo al testigo Quiñones Quiñones, y el 26 de julio de 1978, sin previo aviso, se personaron a su residencia en Ponce y lo amenazaron con formularle acusaciones por varios delitos si no alteraba su declaración.

Quedó probado que los dos efectuaron una investigación plagada de múltiples omisiones y deficiencias respecto a: (1) la evidencia real y objetiva en la escena (impactos en el portón, Volkswagen y vehículo público de Ortiz Molina, casquillos de armas largas, pantalón lleno de sangre y sucio a nivel de las rodillas con arena y tierra, máscara, botas, ropa interior y zapatos); (2) los análisis periciales de esos objetos; (3) la evidencia de agresión policíaca que surgía de los cadáveres de las víctimas Darío Rosado y Soto Arriví (fotografías y autopsia del primero), y (4) en torno a los testimonios perpetuados durante la investigación (origen del "alto" descrito por González Malavé el 31 de julio de 1978)." *Id.*.

Además, señalamos:

"En *particular,* los querellados Colton Fontán y Figueroa Vivas, más que un celo profesional legítimo, aquí exhibieron animosidad desproporcionada y persecución impermisible contra unos testigos y participaron en una acción concertada conspiratoria. Cánones 5, 15 y 35 del Código de Ética Profesional, *supra*. Ignoran factores vitales en cuanto a la confiabilidad de los testimonios y de ese modo evadieron llegar, con razonable certeza, a la entraña de la verdad.

Ambos violaron el sagrado deber de buscar la verdad y de abstenerse de sugerir a testigos que declararan falsamente." *In re Colton Fontán,* supra, pág. 112.

Finalmente expresamos:

"Incurrieron Colton Fontán y Figueroa Vivas en serios actos de negligencia crasa. *Por las posiciones jerárquicas que ocupaban, sus conductas obstaculizaron y contribuyeron a retrasar por años el descubrimiento de lo realmente sucedido en el Cerro Maravilla. Mancharon la imagen del Ministerio Fiscal y debilitaron la efectividad del importante rol que desempeña en el sistema de justicia criminal. Canon 38 del Código de Ética Profesional,* supra. *A la violencia física ilegal de la Policía añadieron la violación ética." In re Colton Fontán,* supra, pág. 113.

V

Aun si el Peticionario tuviera la razón respecto a algunos de los múltiples errores que señala en su Réplica al Informe del Comisionado Especial, entendemos que ello no justifica la reapertura del caso que dio lugar a su desaforo, es decir, que ello no variaría las conclusiones sobre la negligencia crasa en que incurrió el Peticionario al conducir la investigación del trágico caso del Cerro Maravilla. El manejo impropio de testigos, la adhesión a la teoría falsa de defensa propia de la policía, la condición de los cadáveres de los ultimados, las ráfagas de disparos y otros factores señalados en la opinión de este Tribunal en

*In re: Colton Fontán,* supra, son hechos que a la luz de la evidencia que aduce el Peticionario, no están sujetos a rectificación. El Peticionario, en su deficiente investigación, no descubrió la realidad de lo ocurrido en el Cerro Maravilla, permitiendo así que se desconociera la gravedad de unos asesinatos hasta que años después su descubrimiento sacudió la conciencia moral de este pueblo.

El Peticionario no ha demostrado a nuestra satisfacción que la evidencia presentada o propuesta cumple con los requisitos de una moción de nuevo juicio en un procedimiento criminal, que el Comisionado Especial aplicó con la anuencia de las partes, lo cual es propio bajo las circunstancias particulares de este caso.

Examinada en su totalidad la prueba presentada, así como la propuesta, concluimos que ésta no cumple con uno o varios de los siguientes requisitos: (i) que no se pudo descubrir con razonable diligencia antes de las vistas originales de desaforo, (ii) no es prueba meramente acumulativa, (iii) no impugna la prueba aducida durante la vista de desaforo, (iv) es creíble y (v) probablemente produciría un resultado distinto. *Pueblo v. Morales Rivera,* supra; *Pueblo v. Beltrán,* supra, *Pueblo v. Ortiz,* supra; *Pueblo v. Morales,* supra.

Por las razones antes expuestas se desestima la solicitud del Peticionario de reapertura de los procedimientos que dieron lugar a su desaforo.

Publíquese.

Lo acordó el Tribunal y certifica la Secretaria del Tribunal Supremo.


Patricia Otón Olivieri
Secretaria del Tribunal Supremo